(No. 80726.—<span style="background:black">    </span>

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PETER BURTON, Appellant.

*Opinion filed October 1, 1998.—Rehearing denied
November 30, 1998.*

2

4

Charles M. Schiedel, Deputy Defender, and Kim Robert Fawcett, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Jon J. Walters, Assistant State's Attorneys, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Defendant was indicted in Cook County on six counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1), (a)(2), (a)(3)), three counts of home invasion (Ill. Rev. Stat. 1991, ch. 38, par. 12—11(a)(1), (a)(2)), two counts of armed robbery (Ill. Rev. Stat. 1991, ch. 38, par. 18—2(a)), one count of solicitation of murder (Ill. Rev. Stat. 1991, ch. 38, par. 8—1.1(a)), and one count of conspiracy (Ill. Rev. Stat. 1991, ch. 38, par. 8—2(a)). Defendant pleaded guilty to all charges and waived sentencing by jury. The circuit court found defendant eligible for the death penalty. After hearing evidence in aggravation and mitigation, the circuit court sentenced defendant to

death. Defendant's death sentence was stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this court. Ill. Const. 1970, art. VI, § 4(b); 720 ILCS 5/9—1(i) (West 1994); 134 Ill. 2d R. 603. We affirm.

## BACKGROUND

The State provided a factual basis for defendant's guilty plea. In essence, this factual basis revealed that defendant shot and killed Frank Gorzelanny and his wife, Evelyn Gorzelanny, at their home in Calumet City on December 31, 1992. Defendant committed these actions at the solicitation and request of the victims' son, David Gorzelanny.

On September 26, 1994, before defendant pleaded guilty, defendant asked for a fitness hearing. This request was based on a report by Dr. Lynn Maskel, a forensic psychiatrist. In the report, Dr. Maskel stated that defendant was suffering from clinical depression and would not be able to assist in his defense. Dr. Maskel noted that defendant was currently being treated with psychotropic medication, recommended that defendant continue to be treated with psychotropic medication, and stated that the treatment would likely enable defendant to assist in his defense within a year.

On May 15, 1995, about eight months later, the parties proceeded by way of stipulation at a fitness hearing. The parties stipulated to the testimony of two psychiatrists. The parties stipulated that Dr. Roni Seltzberg, who was ordered to evaluate defendant by the circuit court, would testify that she had reviewed defendant's records and had examined defendant. She would testify that defendant understood the nature of the proceedings, could assist in his defense, and was fit to stand trial or to enter a plea. Dr. Maskel, who had previously examined defendant, reached a similar conclusion. The parties stipulated that she would testify defendant understood the nature of the proceedings and could now assist in his

defense. After hearing the stipulations, the circuit court found defendant fit to stand trial or to enter a plea.

On July 7, 1995, after admonishment, defendant entered a plea of guilty. The factual basis incorporated a written statement made by defendant to the police. According to this statement, David Gorzelanny initially approached defendant about the killings in early December 1992. David Gorzelanny said that he would pay defendant a large sum of money and mentioned the amount of $25,000. David Gorzelanny also indicated that the money would come from a trust fund.

According to defendant's statement, defendant and another individual, Scott Stodula, went to the home of the victims on December 31, 1992. While traveling to the home, defendant and Stodula considered tying up the victims in the basement and using a knife to cut their throats. When they arrived, defendant and Stodula were invited into the home. They watched television with the victims for about half an hour. The victims' son was not present during this time. At some point, while sitting with the victims in the living room, defendant stood up, pulled a gun from his pocket, and stepped toward Frank Gorzelanny. Defendant fired the gun, hitting Frank Gorzelanny in the head. Defendant then stepped to his left and pointed the gun at Evelyn Gorzelanny. According to defendant's statement, Evelyn Gorzelanny said something like "Oh, no," or "Oh, my God." Defendant fired two more times, hitting Evelyn Gorzelanny twice in the head.

After the shootings, Stodula ripped open the pants pocket of Frank Gorzelanny and took money and identification from the pants pocket. Defendant and Stodula went to the bedrooms and pulled out some drawers. They then drove to the apartment of Stodula's girlfriend, where they split the money between themselves and changed clothes. Defendant and Stodula drove to the

Hammond Rescue Mission in Hammond, Indiana, where defendant, Stodula, and David Gorzelanny were living. Defendant put the gun in a boot under his bed. Defendant and Stodula then drove to Gary, Indiana, where defendant threw away the clothes he and Stodula had worn during the killings.

Later that night, defendant and Stodula returned to the victims' home, wearing gloves. Defendant suggested that they take a television to make it look like a burglary. Stodula told defendant that David Gorzelanny would come to the home the next morning to give the home the appearance of a burglary.

In addition to defendant's statement, the State presented other evidence as part of the factual basis. On January 1, 1993, David Gorzelanny called the police to report his parents' deaths. In the course of the investigation, the police interviewed David Gorzelanny, Stodula, and defendant. All three confessed their involvement in the murders. The police later recovered a gun from a shoe at defendant's residence and clothing that had been dumped in Indiana. The police also recovered four boxes of jewelry, taken from the victims' home, among Stodula's possessions. After hearing this factual basis, the circuit court accepted defendant's guilty plea.

The case proceeded to sentencing. On July 25, 1995, defendant waived a jury for sentencing at both the eligibility phase and the aggravation/mitigation phase. The circuit court determined that defendant was eligible for the death penalty. The court found defendant eligible under four separate statutory bases: (1) multiple murder (720 ILCS 5/9—1(b)(3) (West 1994)), (2) contract murder (720 ILCS 5/9—1(b)(5) (West 1994)), (3) murder during the course of another felony (720 ILCS 5/9—1(b)(6) (West 1994)), and (4) cold, calculated, and premeditated murder (720 ILCS 5/9—1(b)(11) (West 1994)).

After defendant was found eligible for the death

penalty, defense counsel made a motion to withdraw from the case. Defense counsel stated that defendant wanted to be sentenced to death and had directed defense counsel not to introduce mitigating evidence. Defense counsel stated that he had ethical reservations about representing an individual who wanted to be sentenced to death. When defendant was asked if he wanted defense counsel to withdraw, defendant said that he had no objection.

On August 2, 1995, the circuit court heard argument on the motion to withdraw and denied the motion. The court noted that defense counsel had a great deal of experience in death penalty litigation. The circuit court further stated that it would consider, in mitigation, the presentence report and a report prepared by a mitigation specialist. The circuit court also stated that defendant would have the right to allocution. The circuit court emphasized that it would make the ultimate decision concerning the death penalty and would carefully consider the mitigating evidence.

On October 3, 1995, the circuit court conducted a hearing to determine defendant's fitness for sentencing. During the proceedings, defendant had continued taking psychotropic medication. Dr. Seltzberg, who had evaluated defendant before defendant made his guilty plea, examined defendant again. She testified that defendant understood the nature of the proceedings and was able to assist in his defense. She also testified that the psychotropic medication would not interfere with defendant's understanding of the sentencing proceedings and the consequences of sentencing. After hearing this testimony, the circuit court found defendant fit for sentencing.

On October 5, 1995, the court considered aggravation and mitigation evidence to determine if the death penalty should be imposed. In aggravation, the State presented evidence that defendant had received an "other than honorable discharge" from the United States Navy in

1989. Defendant was discharged based on an unauthorized absence from the Navy in excess of 30 days. The State also presented evidence that defendant had stolen money from a pub in Lansing, Illinois, in 1990. Defendant pleaded guilty to theft and was sentenced to 18 months' probation.

Finally, the State introduced evidence about defendant's possible involvement in an Indiana murder that occurred in 1992. The victim was an individual who had occasionally hired defendant for remodeling work. The victim died from blunt-force injuries to the head and multiple stab wounds. Defendant and another individual were observed at the crime scene near the time of the killing, had possession of the victim's truck after the killing, had used the victim's credit card after the killing to stay at a motel, and had made several false statements in connection with their use of the credit card. The State did not introduce any evidence to show that defendant was being tried for, or had been convicted of, the crime in Indiana. Pursuant to defendant's wishes, defense counsel did not cross-examine any witnesses.

Defense counsel did not introduce any mitigating evidence, again pursuant to defendant's wishes. The circuit court stated that it would consider the presentence report and a report by a mitigation specialist. The mitigation report extensively detailed defendant's background. The report showed that defendant had a history of alcohol abuse and came from an alcoholic family. Defendant had suffered from clinical depression and had made two possible suicide attempts or gestures. The report also indicated that defendant felt estranged from his father and felt remorse for his conduct. The circuit court also considered mental health records from Cermak Health Services and alcohol treatment records from Tri-City Community Mental Health Center. In closing argument, defense counsel argued that defendant had a severe

drinking problem and mental health problems. In allocution, defendant said that he was sorry for the killings but that he deserved no mercy.

On October 11, 1995, after hearing the aggravating and mitigating evidence, the circuit court sentenced defendant to death. The circuit court stated that it had received "volumes of information" on defendant's background. The court noted the cold-blooded and execution-style manner of the killings. The court also stated that two statutory mitigating factors applied: defendant's lack of significant criminal history (720 ILCS 5/9—1(c)(1) (West 1994)) and defendant's extreme mental or emotional disturbance at the time of the murders (720 ILCS 5/9—1(c)(2) (West 1994)). The court found, however, that there were no mitigating factors sufficient to preclude imposition of the death penalty (720 ILCS 5/9—1(h) (West 1994)).

In this appeal, defendant raises 10 issues. Specifically, defendant argues: (1) he did not receive a full fitness hearing to determine the impact of psychotropic medication on his fitness; (2) the circuit court failed to properly admonish defendant of the steps needed to perfect an appeal from his guilty plea; (3) the circuit court violated defendant's right to self-representation; (4) the circuit court erred in failing to order a sanity evaluation for defendant; (5) the circuit court should have ordered defense counsel to investigate and present all available mitigation evidence despite defendant's wishes; (6) improper aggravation evidence was presented at sentencing; (7) the circuit court erred in failing to consider certain nonstatutory mitigating factors; (8) the death penalty is excessive in this case; (9) the circuit court considered an unconstitutionally vague statutory aggravating factor at sentencing; and (10) the death penalty statute is unconstitutional. We address each issue in turn.

## ANALYSIS

### I. Psychotropic Medication

Defendant first argues that the circuit court erred when it found defendant fit to enter a plea following a stipulated fitness hearing. Defendant argues that the circuit court had a duty to conduct a more complete evidentiary hearing into the effects of the psychotropic medication on defendant's mental condition and failed to do so. Defendant therefore argues that this cause must be remanded for a full evidentiary fitness hearing.

A defendant is unfit to stand trial or to enter a plea if, based on a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. 725 ILCS 5/104—10 (West 1994); *People v. Haynes*, 174 Ill. 2d 204, 226 (1996). Defendant's fitness is presumed by statute. 725 ILCS 5/104—10 (West 1994). If a *bona fide* doubt of defendant's fitness is raised, however, the circuit court must hold a fitness hearing before proceeding further. 725 ILCS 5/104—11(a) (West 1994); *Haynes*, 174 Ill. 2d at 226. The circuit court's ruling on the issue of fitness will be reversed only if it is against the manifest weight of the evidence. *Haynes*, 174 Ill. 2d at 226; *People v. Mahaffey*, 166 Ill. 2d 1, 18 (1995).

At the time defendant entered his guilty plea, section 104—21(a) of the Criminal Code of 1961 (725 ILCS 5/104—21(a) (West 1994)) provided that a defendant who is receiving psychotropic medication "is entitled to a hearing on the issue of his fitness while under medication."[1] Under this statute, a defendant who is taking psychotropic medication is entitled to a fitness hearing.

---

[1] We note that section 104—21(a) was amended by Public Act 89—428, eff. January 1, 1996 (see 725 ILCS 5/104—21(a) (West Supp. 1997)). The effective date of the amendment was after defendant was convicted and sentenced but before the circuit court's consideration of the post-trial motions. The statute, as amended,

Defendant relies on past cases from this court where a defendant taking psychotropic medication did not receive a fitness hearing before trial or before entering a plea. In certain circumstances, these defendants' convictions were reversed because no fitness hearings had been conducted. See, *e.g.*, *People v. Kinkead*, 168 Ill. 2d 394 (1995); *People v. Gevas*, 166 Ill. 2d 461 (1995); *People v. Brandon*, 162 Ill. 2d 450 (1994); *cf. People v. Neal*, 179 Ill. 2d 541 (1997); *People v. Burgess*, 176 Ill. 2d 289 (1997).

The cases cited by defendant are clearly distinguishable. In the instant case, defendant did receive a fitness hearing. In fact, he received two: one before entry of his plea and another before sentencing. Defendant concedes that he received fitness hearings but argues that he was entitled to receive a more searching inquiry into his fitness while under medication. He argues that the circuit court was on notice that psychotropic medication was involved but did not make a specific determination that defendant was fit with medication before entry of his

---

provided that "no hearing is required unless the court finds there is a bona fide doubt of the defendant's fitness." The statute was again amended by Public Act 89—689, effective December 31, 1996 (see 725 ILCS 5/104—21(a) (West 1996)), while the case was pending on appeal. The statute, as amended, provided that "[a] defendant who is receiving psychotropic drugs shall not be presumed to be unfit to stand trial solely by virtue of the receipt of those drugs or medications."

Defendant argues that the original version of the statute applies and requires a fitness hearing on the effects of psychotropic medication. The State argues that the most recent version of the statute applies retroactively and does not entitle defendant to any fitness hearing. Compare *People v. Kinkead*, 182 Ill. 2d 316 (1998) (opinion of McMorrow, J., joined by Freeman & Nickels, JJ.), with *Kinkead*, 182 Ill. 2d at 350 (Heiple, J., dissenting, joined by Miller & Bilandic, JJ.). We need not address these amendments. Even assuming that the original version of the statute applies, defendant received a proper fitness hearing.

plea. He argues that such a determination is required by the statute.

We disagree. The statute provides that the taking of psychotropic medication is sufficient to warrant an evaluation of defendant's fitness at a hearing. The circuit court is not required to make an express finding of fitness with medication. Regardless of whether a defendant is taking psychotropic medication, the statutory requirements for fitness remain the same. The statute does not create a right to a separate fitness hearing solely on the effects of psychotropic medication. In this respect, we agree with the reasoning of the appellate court in *People v. Steinmetz*, 287 Ill. App. 3d 1, 4-5 (1997). A finding of fitness may, however, be against the manifest weight of the evidence where the circuit court completely disregards evidence regarding the effects of psychotropic medication.

In the instant case, the record shows that the effects of the psychotropic medication were addressed in the circuit court. In seeking a fitness hearing, defendant relied on the report of Dr. Maskel. Dr. Maskel initially stated that defendant suffered from clinical depression. She further stated that defendant understood the nature of the proceedings against him but could not assist in his defense. Dr. Maskel noted that defendant was taking psychotropic medication, Zoloft and Prolixin, and that defendant's mental condition would probably improve with therapy and medication.

Dr. Maskel conducted a follow-up examination on May 11, 1995, four days before the fitness hearing, and filed a report in connection with this examination. In the report, she stated that defendant's mental condition had improved significantly, probably as a result of the medication. She concluded that defendant both understood the nature of the legal proceedings and could assist in his defense. Dr. Seltzberg also examined defendant and reviewed defendant's records. Dr. Seltzberg concluded

that defendant understood the nature of the proceedings and could assist in his defense.

We further note that the circuit court conducted a second fitness hearing prior to sentencing. This second hearing occurred on October 3, 1995, about three months after defendant entered his plea. At the second hearing, Dr. Seltzberg testified that she had evaluated defendant on three separate occasions over the course of nearly a year. She testified that he understood the nature of the proceedings against him and was able to assist in his defense on all three occasions. She also testified that defendant was taking Zoloft. She testified about the side effects of Zoloft, stating that such side effects are quite minor and short lived. In addition, defendant had not complained of any side effects to her. Dr. Seltzberg further testified that if defendant stopped taking Zoloft, defendant would probably be unchanged. She stated that Zoloft would not interfere with defendant's ability to understand the hearing on aggravating and mitigating evidence.

These reports and testimony showed that defendant was using psychotropic medication and addressed the effect of this medication on fitness. The psychiatrists considered the medication in reaching their opinions and this information was presented to the circuit court. In the absence of any indication to the contrary, we conclude that the circuit court evaluated the psychiatric reports and testimony in making its fitness determinations. The circuit court's determinations were not against the manifest weight of the evidence.

In a related argument, defendant argues that his counsel was ineffective for stipulating to the testimony of the two psychiatrists at the fitness hearing before entry of his plea. To show ineffective assistance of counsel, a defendant must establish both: (1) that trial counsel's representation was deficient and (2) that this deficient

performance resulted in prejudice to defendant. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 524-25 (1984). Defendant fails to meet either prong. First, parties may stipulate to the opinion testimony of psychiatrists at a fitness hearing. *People v. Lewis*, 103 Ill. 2d 111, 116 (1984); see also *People v. Williams*, 274 Ill. App. 3d 793, 802 (1995). Trial counsel's performance was not *per se* deficient based on the stipulations. Second, defendant has not shown prejudice. Defendant has not presented any new information or argument that could have been offered to support a finding of unfitness.

## II. Supreme Court Rule 605(b)

Defendant next argues that the circuit court erred when it instructed defendant how to perfect an appeal following his guilty plea. Defendant argues that the circuit court failed to fully admonish him, as provided under Supreme Court Rule 605(b) (145 Ill. 2d R. 605(b)). Defendant argues that this case should be remanded to the circuit court for further proceedings consistent with Rule 605(b).

Rule 605(b) provides that the circuit court should give certain admonishments to a defendant after defendant submits a guilty plea. Specifically, the circuit court should advise defendant: (1) that he has a right to appeal, (2) that he must file a motion to withdraw guilty plea or reconsider sentence before taking an appeal, (3) that if the motion is allowed, the circuit court will modify the sentence or vacate the judgment and sentence and proceed to trial, (4) that the State may pursue any charges that were dismissed as part of the plea agreement, (5) that if defendant is indigent, transcripts and counsel will be provided to assist him in the preparation of the motions, and (6) that any claims of error not raised in a motion to withdraw guilty plea or reconsider sentence will be deemed waived on appeal. 145 Ill. 2d R.

605(b). Significantly, without such admonishments, a defendant may fail to file a motion to withdraw his guilty plea or a motion to reconsider sentence. Such post-trial motions are necessary to preserve issues for appeal. See *People v. Jamison*, 181 Ill. 2d 24 (1998); see also 145 Ill. 2d R. 604(d).

In the instant case, after sentencing, the circuit court advised defendant that an appeal to this court was automatically perfected without further action by defendant and that defendant would have the right to counsel and transcripts on appeal if he was indigent. An appeal in a capital case is automatically perfected under Rule 606(a) (134 Ill. 2d R. 606(a)) without further action by a defendant. It is clear from the record, however, that the circuit court did not fully admonish defendant in accordance with Rule 605(b). The circuit court failed to advise defendant that he could file a motion to withdraw his guilty plea or reconsider sentence and that the failure to do so would result in waiver of issues on appeal. Where the circuit court fails to admonish a defendant pursuant to Rule 605(b) and the defendant fails to file a motion to withdraw guilty plea, the cause must be remanded to the circuit court to give the defendant an opportunity to file a motion to withdraw his guilty plea. *Jamison*, 181 Ill. 2d 24. Similarly, where the circuit court fails to admonish a defendant about his right to file a motion to reconsider sentence and the defendant does not file such a motion, the cause must be remanded to the circuit court to give the defendant an opportunity to file a motion to reconsider sentence. *People v. Foster*, 171 Ill. 2d 469 (1996).

Despite the circuit court's failure to fully admonish defendant, two post-sentencing motions were filed on defendant's behalf. The first motion was filed on October 18, 1995, by Frank Rago of the public defender's office of Cook County. Rago was defendant's counsel during the

earlier proceedings before the circuit court. The motion asked the circuit court to vacate the death sentence. It summarily stated that certain issues existed that would preclude imposition of the death penalty. The public defender's office further indicated that it had not yet received all of the transcripts and asked leave to supplement the motion with specific issues when the transcripts were received.

The second motion was filed on January 29, 1996, again by the public defender's office but by a different assistant public defender, Jeffrey Howard. The second motion sought to vacate the death penalty and asked for additional proceedings. In the second motion, the claims of error were specifically enumerated. The second motion attacked both the guilty plea and the death sentence. The motion challenged defendant's guilty plea on several grounds. Specifically, defendant claimed that: (1) the factual basis for the plea was improper because it contained the confessions of the codefendants, (2) the plea did not establish solicitation to commit murder, (3) the plea was not knowingly and voluntarily made by defendant based on the alleged lack of a fitness hearing before entry of the plea and improper admonitions by the circuit court, (4) trial counsel was ineffective for not exploring the issue of insanity prior to entry of the guilty plea, and (5) trial counsel was ineffective for not challenging part of the factual basis. The second motion also raised numerous other issues that related to sentencing. In essence, defendant asked the circuit court both to vacate the guilty plea and to reconsider sentence.

The circuit court held a hearing on both motions. Rago argued that the death penalty should not be imposed because defendant had changed substantially since the time of the murders and that defendant suffered from mental illness. Howard argued that the factual basis for the plea was unreliable because it was based on

the confessions of codefendants and that the plea was entered before any fitness hearing was held. Howard specifically stated that he was attacking the judgment based on the guilty plea. Howard also argued sentencing issues, including ineffective assistance of counsel by Rago. The circuit court denied the motions.

Although the circuit court failed to specifically advise defendant about filing motions to withdraw his guilty plea and to reconsider sentence, defendant did file post-sentencing motions attacking both the guilty plea and the sentence. The circuit court had the opportunity to consider these issues and correct any errors. Accordingly, the circuit court's failure to fully admonish defendant was harmless error.

### III. Representation During Sentencing

Defendant next argues that he was deprived of his right to proceed *pro se* during sentencing. He argues that he made a clear and unequivocal request to represent himself during sentencing. Defendant argues that the circuit court erred by failing to allow him to waive counsel and proceed *pro se*.

On July 25, 1995, after defendant was found eligible for the death penalty, defense counsel made a motion to withdraw from the case. Defense counsel stated that the basis for this motion was defendant's desire to seek the death penalty and wish not to introduce any mitigating evidence. Defendant acknowledged that he did not care to present mitigating evidence but wanted to review records held by defense counsel. Defense counsel had refused to review these records with defendant. Defendant stated that he would be willing to have defense counsel withdraw and have the circuit court consider allowing defendant to proceed *pro se*. When asked explicitly if he wanted to represent himself, defendant stated that he wanted access to the records. To obtain these records, he would be willing to proceed *pro se* or be appointed co-

counsel. The circuit court continued the case for a hearing on the motion to withdraw.

On August 2, 1995, the circuit court directed defense counsel to make a copy of his records and turn the copy over to defendant. Defense counsel renewed his argument to withdraw from the case based on defendant's desire not to present mitigating evidence. In response, defendant stated that he had no objection and that he felt sympathy for defense counsel. Defendant stated that it would be best if defense counsel were allowed to withdraw from the case in order to spare defense counsel any further personal distress. Defendant stated that he would present no mitigation and ask for no favors because he would then be representing himself. After considering the matter, the circuit court denied defense counsel's motion to withdraw from the case.

Under *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), a defendant has a sixth amendment right to represent himself. This constitutional right applies to the states through the due process clause of the fourteenth amendment. *Faretta*, 422 U.S. at 818, 45 L. Ed. 2d at 572, 95 S. Ct. at 2532-33. In order to represent himself, a defendant must knowingly and intelligently relinquish his right to counsel. *Faretta*, 422 U.S. at 835, 45 L. Ed. 2d at 581, 95 S. Ct. at 2541. The Court found that the defendant waived counsel where he clearly and unequivocally told the trial judge he wanted to represent himself weeks before trial. *Faretta*, 422 U.S. at 835, 45 L. Ed. 2d at 582, 95 S. Ct. at 2541.

It is well settled that waiver of counsel must be clear and unequivocal, not ambiguous. *People v. Meeks*, 249 Ill. App. 3d 152, 169 (1993); *People v. Terry*, 177 Ill. App. 3d 185, 191-92 (1988); *People v. Woodruff*, 85 Ill. App. 3d 654, 660 (1980); *United States v. Jones*, 938 F.2d 737, 742 (7th Cir. 1991); *Reese v. Nix*, 942 F.2d 1276, 1280 (8th Cir. 1991); *United States v. Betancourt-Arretuche*, 933

F.2d 89, 92 (1st Cir. 1991); *Burton v. Collins*, 937 F.2d 131, 133 (5th Cir. 1991); *Adams v. Carroll*, 875 F.2d 1441, 1444 (9th Cir. 1989); *Raulerson v. Wainwright*, 732 F.2d 803, 808 (11th Cir. 1984); *People v. Marshall*, 15 Cal. 4th 1, 21, 931 P.2d 262, 271, 61 Cal. Rptr. 2d 84, 93 (1997); *State v. Brown*, 342 Md. 404, 412-13, 676 A.2d 513, 518 (1996); *State v. Carter*, 200 Conn. 607, 612-13, 513 A.2d 47, 50 (1986). A defendant is entitled to the representation of counsel at all critical stages of a criminal prosecution, and this important right will not be taken away unless affirmatively waived by a defendant. *Burton*, 937 F.2d at 133; *Marshall*, 15 Cal. 4th at 20, 931 P.2d at 270, 61 Cal. Rptr. 2d at 92. A defendant waives his right to self-representation unless he "articulately and unmistakably demands to proceed *pro se.*" *United States v. Weisz*, 718 F.2d 413, 426 (D.C. Cir. 1983). A defendant must explicitly inform the trial court he wants to proceed *pro se* because "[a]nything else is an effort to sandbag the court and the opposition, to seek an acquittal with an ace up the sleeve to be whipped out in the event of conviction." *Cain v. Peters*, 972 F.2d 748, 750 (7th Cir. 1992).

In determining whether a defendant's statement is clear and unequivocal, courts have looked at the overall context of the proceedings. A court must determine whether the defendant truly desires to represent himself and has definitively invoked his right of self-representation. Compare *Marshall*, 15 Cal. 4th at 27, 931 P.2d at 274, 61 Cal. Rptr. 2d at 97 (the defendant made his request to avoid providing blood and tissue samples and for the purpose of delay, instead of an actual desire to represent himself); *Burton*, 937 F.2d at 133-34 (the defendant's inquiry into the possibility of self-representation after denial of substitute counsel was not an unequivocal assertion of right to proceed *pro se*); *People v. Brooks*, 75 Ill. App. 3d 109, 110 (1979) (the defendant did not waive counsel where he stated that he

did not need counsel " 'at this present time' " in order to avoid a continuance at a preliminary hearing and did not renew the request at later proceedings); *Jones*, 938 F.2d at 742-43 (the defendant was seeking more time to retain other counsel when she told her attorney she was prepared to proceed *pro se* rather than have the attorney represent her); *Reese*, 942 F.2d at 1281 (the defendant did not invoke his right to self-representation by his isolated, offhand statement expressing frustration at the trial court's denial of a request for new counsel); *Jackson v. Ylst*, 921 F.2d 882, 888-89 (9th Cir. 1990) (the defendant's statement was an impulsive response to the trial court's denial of his request for substitute counsel, which was not renewed), with *United States v. Arlt*, 41 F.3d 516, 519-20 (9th Cir. 1994) (the defendant repeatedly and forcefully asserted his right to proceed *pro se* beginning six months before trial); *Spencer v. Ault*, 941 F. Supp. 832, 843 (N.D. Iowa 1996) (the defendant told the trial judge that he wanted to represent himself at least five times and accepted counsel only when forced to do so); *Snead v. State*, 286 Md. 122, 127, 406 A.2d 98, 100-01 (1979) (the trial judge forced the defendant to accept a court-appointed attorney after the defendant chose to proceed *pro se* in terms admitting of no doubt or misunderstanding). Courts must "indulge in every reasonable presumption against waiver" of the right to counsel. *Brewer v. Williams*, 430 U.S. 387, 404, 51 L. Ed. 2d 424, 440, 97 S. Ct. 1232, 1242 (1977).

Even if a defendant gives some indication that he wants to proceed *pro se*, he may later acquiesce in representation by counsel. Under certain circumstances, defendant may acquiesce by vacillating or abandoning an earlier request to proceed *pro se*. See, *e.g.*, *Meeks*, 249 Ill. App. 3d at 170; *Williams v. Bartlett*, 44 F.3d 95, 100-01 (2d Cir. 1994); *Brown v. Wainwright*, 665 F.2d 607, 611 (5th Cir. 1982). In determining whether a defendant

seeks to relinquish counsel, courts may look at the defendant's conduct following the defendant's request to represent himself. See *Raulerson*, 732 F.2d at 808-09 (the defendant waived his right to represent himself where he voluntarily and abruptly left the courtroom after asking to represent himself); *Bennett*, 909 F. Supp. 1169, 1175-76 (N.D. Ind. 1995) (the defendant acquiesced in the representation of his court-appointed counsel where he raised the possibility of proceeding *pro se* but did not mention the issue again after the trial judge declined to appoint substitute counsel); but see *Orazio v. Dugger*, 876 F.2d 1508, 1512 (11th Cir. 1989) (the defendant did not acquiesce where his request to represent himself was conclusively denied and a renewed request would have been fruitless). A defendant may forfeit self-representation by remaining silent at critical junctures of the proceedings. *Cain*, 972 F.2d at 750.

The timing of a defendant's request is also significant. A number of courts have held that a defendant's request is untimely where it is first made just before the commencement of trial, after trial begins, or after meaningful proceedings have begun. See, *e.g.*, *Jones*, 938 F.2d at 743; *United States v. Oakey*, 853 F.2d 551, 553 (7th Cir. 1988); *Betancourt-Arretuche*, 933 F.2d at 92; *Pitts v. Redman*, 776 F. Supp. 907 (D. Del. 1991); *Woodruff*, 85 Ill. App. 3d at 660; *Mallory v. State*, 225 Ga. App. 418, 422, 483 S.E.2d 907, 911 (1997). Once such proceedings have begun, the trial judge has discretion to deny a defendant's request to represent himself. *Oakey*, 853 F.2d at 553; *Pitts*, 776 F. Supp. at 915.

In the instant case, we reject defendant's argument that he was denied his right to represent himself. Defendant did not clearly and unequivocally invoke his right to represent himself. At the first hearing, defendant wanted access to defense counsel's records. He stated that he would be willing to proceed *pro se* or be appointed co-

counsel, if necessary, to obtain these records. Thus, defendant indicated a conditional willingness to represent himself at some point if he could not get access to these records. Defendant was given access to the records.

At the second hearing, in the context of a motion to withdraw, defendant stated that he was willing to allow defense counsel to withdraw from the proceedings. Defendant restated his desire to obtain defense counsel's records and expressed sympathy for defense counsel's difficult situation. Defense counsel had generally cooperated with defendant during the course of the proceedings to promote defendant's wishes. Aside from access to the records, defendant expressed no dissatisfaction with counsel's performance. After the motion to withdraw was denied, defendant gave no indication that he wanted to represent himself.

In addition, we note the timing of this exchange. The statements made by defendant occurred after entry of the guilty plea and after defendant was found eligible for the death penalty. These statements were made during sentencing. Even assuming defendant's statements could be construed as a clear and unequivocal request to represent himself, the circuit court generally has discretion to determine whether to allow a defendant to proceed *pro se* after meaningful proceedings have been conducted. Given counsel's intimate and lengthy involvement in the case and the stage of the proceedings, the circuit court did not abuse its discretion in requiring counsel's continued representation.

### IV. Evaluation of Defendant's Sanity

Defendant next argues that the circuit court erred in failing to require an evaluation of his sanity. Defendant argues that an evaluation of his sanity would have established his mental state at the time of the offense and would have provided possible mitigating evidence for sentencing. Defendant further argues that the circuit

court should have required such an evaluation before he entered his guilty plea. Defendant argues that this cause should be remanded for a psychiatric evaluation of sanity.

Prior to defendant's guilty plea, defendant requested an evaluation of his fitness. On April 26, 1995, the circuit court entered an order directing Dr. Seltzberg to evaluate defendant's mental health, including but not limited to fitness to plead or stand trial, and, if currently possible, sanity. On May 8, 1995, Dr. Seltzberg submitted a letter stating that, after evaluating defendant, she believed defendant was fit to plead or stand trial and that her opinion regarding other issues was deferred at that time. She therefore did not give an opinion regarding defendant's sanity. She stated that she would conduct a further evaluation of defendant if the court so desired. On July 7, 1995, defendant entered a plea of guilty. In a post-sentencing motion, defendant argued that defense counsel was ineffective for failing to explore the issue of insanity before entry of the guilty plea. In denying the motion, the circuit court stated that it saw no evidence indicating that a psychiatric examination of sanity would have been appropriate.

Initially, we note that fitness and insanity raise different inquiries. *People v. Coleman*, 168 Ill. 2d 509, 524 (1995). As stated earlier, a defendant is unfit to plead if he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. 725 ILCS 5/104—10 (West 1994). Fitness addresses a defendant's ability to function and participate in court proceedings. In contrast, the issue of insanity is a defense that may be raised at trial. Pursuant to statute, insanity involves whether a defendant, because of a mental disease or defect, lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. 720 ILCS 5/6—2(a) (West 1994).

An examination by a clinical psychologist or psychiatrist is generally required where a defendant gives notice that he may rely upon the defense of insanity or if the facts and circumstances of the case justify a reasonable belief that the insanity defense may be raised at trial. 725 ILCS 5/115—6 (West 1994). The defense of insanity is an affirmative defense which defendant has the burden of raising and proving by a preponderance of the evidence at trial. 720 ILCS 5/6—2(e) (West 1994); *People v. Gilmore*, 273 Ill. App. 3d 996, 999-1000 (1995). In addition, the circuit court may order a mental examination of defendant to develop evidence for sentencing. 730 ILCS 5/5—3—2(b), 5—3—3(b) (West 1994).

In the instant case, defendant did not file any notice that he intended to raise the affirmative defense of insanity. Instead, the circuit court found defendant fit to enter a plea and defendant pleaded guilty. The decision of whether to plead guilty is exclusively within the province of a defendant. *People v. Ramey*, 152 Ill. 2d 41, 54 (1992). Once defendant pleaded guilty, the question of sanity was no longer an issue. A plea of guilty waives all nonjurisdictional defenses or defects. *People v. Horton*, 143 Ill. 2d 11, 22 (1991); *People v. Jackson*, 47 Ill. 2d 344, 348 (1970). Once defendant was determined to be fit, he could plead guilty and thereby waive an insanity defense. The circuit court did not err in failing to require a follow-up examination addressing defendant's sanity where defendant was found fit and chose to plead guilty instead of raising sanity as a defense at a trial. Similarly, defense counsel was not ineffective for failing to request a follow-up examination of sanity where defendant chose to plead guilty.

Defendant relies on *People v. Allen*, 101 Ill. 2d 24 (1984), to argue that the circuit court was required to conduct an evaluation of defendant's sanity before accepting the guilty plea. Alternatively, defendant argues

that the circuit court should have ordered an evaluation based on the post-sentencing motions. In *Allen*, 101 Ill. 2d at 29, a medical expert examined the defendant and stated that the defendant suffered from a paranoid condition. The defendant was represented by a succession of attorneys, several of whom tried to explore an insanity defense. The defendant refused to cooperate with these evaluations and pleaded guilty. In a motion to withdraw guilty plea, defense counsel submitted medical records showing that the defendant had previously suffered a head injury and that a portion of his brain had been removed during surgery for a depressed skull fracture. The records also showed that the defendant suffered from seizures. A medical expert gave his opinion that the defendant was legally insane and that further testing was required to more definitely determine the defendant's mental condition. The circuit court refused to order further testing to determine the defendant's sanity. This court stated that ordinarily insanity is a defense that must be raised by defendant at trial. *Allen*, 101 Ill. 2d at 34. Based on the unusual circumstances of the case, however, this court found that the failure to order further testing into the defendant's sanity was reversible error. *Allen*, 101 Ill. 2d at 36-37.

We find *Allen* distinguishable from the instant case. As stated by this court, the circumstances in *Allen* were unusual. Ordinarily, a defendant must raise the defense of insanity or claim of mental illness before an evaluation of sanity is required. In the instant case, the circumstances were not sufficiently severe to require the circuit court to conduct, *sua sponte*, an inquiry into defendant's sanity as a precondition to accepting defendant's plea where defendant was found fit to plead. The reports and testimony of the psychiatrists and other information before the circuit court did not require an evaluation of sanity. Accordingly, we find that the circuit court did not

abuse its discretion in failing to require an evaluation of defendant's sanity.

In a related argument, defendant argues that an evaluation of sanity would have developed mitigating evidence for sentencing. Defendant argues that his decision not to present mitigation evidence was not knowing and intelligent because the mitigation investigation was not adequate. Defendant argues that an evaluation of his sanity would have produced evidence that would have affected the sentencing decision.

We disagree. Initially, we note that an evaluation of sanity is used to inquire into insanity, an affirmative defense that can be presented at trial. 725 ILCS 5/115—6 (West 1994). To the extent that defendant argues that the circuit court should have ordered a mental examination to develop evidence for sentencing (730 ILCS 5/5—3—2(b), 5—3—3(b) (West 1994)), the circuit court did not abuse its discretion in failing to require such an examination. At the time of sentencing, the circuit court had the reports and testimony of Dr. Maskel and Dr. Seltzberg about defendant's mental condition. Dr. Maskel and Dr. Seltzberg had evaluated defendant's mental condition on separate occasions before and during sentencing. The circuit court also possessed mental health records and alcohol treatment records from Cermak Health Services and Tri-City Community Mental Health Center. The circuit court therefore had significant information concerning defendant's mental condition for the purposes of sentencing and was not required to order further mental evaluation of defendant.

Defendant also claims counsel was ineffective for failing to request a mental examination to develop evidence for sentencing. A defendant claiming ineffective assistance of counsel must show: (1) that trial counsel's representation was deficient and (2) that this deficient performance resulted in prejudice to defendant. *Strickland*

*v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 524-25 (1984). Defendant has failed to show prejudice. Defendant can only speculate that an additional evaluation would have produced significant new evidence concerning his mental health, rather than cumulative evidence.

### V. Defendant's Desire Not to Present Mitigation Evidence

Defendant argues that the circuit court had an independent duty to order defense counsel to present all available mitigation evidence, despite defendant's wishes to the contrary. Alternatively, defendant argues that the circuit court should have appointed a special counsel to carry out a mitigation investigation. Defendant argues that the eighth amendment requires that mitigation evidence be presented and considered by the sentencer, even if defendant does not want any mitigation evidence presented. See U.S. Const., amend. VIII.

These arguments have previously been rejected by this court. There is no eighth amendment requirement that mitigating evidence must be presented where a defendant chooses not to introduce any such evidence. *Coleman*, 168 Ill. 2d at 556-57; *People v. Silagy*, 101 Ill. 2d 147, 181-82 (1984). A defendant need only have the opportunity to present mitigating evidence. *Coleman*, 168 Ill. 2d at 557. We decline to overrule these cases.

In any event, the record shows that the circuit court did consider a great deal of mitigation. Defense obtained the services of a mitigation specialist and investigated evidence that could be used in mitigation. *Cf. People v. Perez*, 148 Ill. 2d 168, 187-95 (1992). Although defendant chose not to introduce mitigation evidence at sentencing, the circuit court stated that it would consider the mitigation report prepared by the mitigation specialist and the presentence report. The circuit court also considered defendant's mental health records showing several years

of treatment at Cermak Health Services and alcohol treatment records from Tri-City Community Mental Health Center. In sentencing defendant, the circuit court noted defendant's alcoholism and troubled life. The circuit court expressly addressed two statutory mitigating factors based on the information in these records and reports. Accordingly, defendant's argument is without merit.

## VI. Indiana Murder Case

Defendant next challenges certain evidence offered by the State during sentencing. Specifically, the State introduced testimony suggesting that defendant was involved in a murder in Indiana. Defendant argues that his possible role in this murder was too speculative and prejudicial to be admissible. Defendant argues that the admission of this evidence deprived him of a fair sentencing hearing, that counsel was ineffective for not objecting to it, and that the circuit court should have, *sua sponte*, rejected this evidence.

Two witnesses testified about defendant's possible involvement in the Indiana murder. Douglas Wiech of Hammond, Indiana, testified that he was a friend and neighbor of Doyle Matlock, the victim. The victim had previously hired defendant to do some remodeling at the victim's house. At 4:30 p.m. on February 10, 1992, Wiech saw defendant and another person exit from the entrance to the apartment building in which the victim lived. Wiech testified that defendant's companion kept himself turned away from Wiech. Defendant wanted to use the victim's truck but had the wrong set of keys. The victim had allowed others to use the truck in the past. Defendant reentered the apartment building to get the correct keys to the victim's truck. Later, Wiech saw defendant and his companion leave in the truck. Wiech became worried after 10 p.m. because he had not seen the victim and that was unusual. At about 12:25 a.m., he heard the po-

lice and went outside. He saw the police remove the victim's body from the victim's apartment. An autopsy showed that the victim had suffered blunt trauma wounds to the head and stab wounds.

Mark Woodard testified that he responded to a call at a motel in Lebanon, Indiana, on February 10, 1992. At that time, Woodard worked for the Lebanon police department. Woodard learned that two men had checked into the motel using the victim's credit card. They had misspelled the name Doyle and indicated that they arrived in a Mazda even though there was no Mazda in the parking lot. Woodard and another officer knocked on the men's motel room and a man, identifying himself as Wood, answered the door. Wood said he was not Doyle Matlock and that Doyle was asleep, indicating defendant. Defendant was awakened. After both Wood and defendant denied having the victim's credit card, Wood eventually turned the card over to the police. Wood also had the victim's driver's license. Defendant stated that he and Wood were driving to Louisiana to meet the victim for Mardi Gras. The motel attendant told Wood and defendant to leave the motel. Woodard did not arrest them but told them they could not drive because they had been drinking. Woodard later arrested defendant when defendant began driving the truck. Woodard learned of the victim's murder and Hammond police officers took over the investigation. It is not clear what happened thereafter in the Matlock murder investigation.

The rules of admissibility at sentencing are broader than the rules of evidence at trial. The evidentiary rules of trials are not applied at the second stage of sentencing because, in determining the appropriate sentence, the circuit court must possess the fullest information possible concerning the defendant's life, character, criminal record, and the circumstances of the particular offense. *People v. Hudson*, 157 Ill. 2d 401, 450 (1993). The only

requirement for admissibility at the second stage of sentencing is that evidence be relevant and reliable. *Hudson*, 157 Ill. 2d at 449; *People v. Morgan*, 112 Ill. 2d 111, 143 (1986); see also 720 ILCS 5/9—1(e) (West 1994). The determination of relevance and reliability is a matter within the circuit court's sound discretion. *Hudson*, 157 Ill. 2d at 450; *Morgan*, 112 Ill. 2d at 143.

We find that the circuit court did not err in admitting this evidence. This court has consistently found evidence of a defendant's criminal conduct to be admissible as long as the evidence is relevant and reliable. See *Hudson*, 157 Ill. 2d at 448-53 (circuit court did not err in admitting evidence of the defendant's involvement in an attempted escape from prison and arrests for three prior robberies and an aggravated assault); *People v. Howard*, 147 Ill. 2d 103, 158-60 (1991) (circuit court properly admitted evidence of the defendant's participation in a residential break-in and armed robbery where the charges had been dismissed); *People v. Young*, 128 Ill. 2d 1, 52-54 (1989) (circuit court did not abuse its discretion in admitting hearsay evidence of the defendant's alleged involvement in a murder and attempted murder for which he had not been convicted); *People v. Hall*, 114 Ill. 2d 376, 416-17 (1986) (circuit court did not err in admitting evidence that the defendant, while in prison, was involved in a fight with another inmate in which the inmate was stabbed); *Morgan*, 112 Ill. 2d at 142-44 (circuit court properly admitted hearsay evidence that the defendant had committed an armed robbery and shooting where the charges had been dismissed); *People v. Brisbon*, 106 Ill. 2d 342, 364-65 (1985) (circuit court did not abuse its discretion in admitting evidence of the defendant's involvement in a killing where a charge had been dismissed for want of probable cause).

The evidence in the instant case would, at least, support an inference that defendant was present at the

victim's murder and was involved. It was the circuit court's function to give this evidence the appropriate weight. Accordingly, we find that the circuit court did not err in admitting this evidence. Similarly, we reject defendant's claim that counsel was ineffective for failing to object to this aggravating evidence, given that the evidence was admissible. See *People v. Hampton*, 149 Ill. 2d 71, 111-12 (1992).

## VII. Nonstatutory Mitigating Factors

Defendant next argues that the circuit court erred when it found that there were no mitigating factors sufficient to preclude imposition of the death penalty. Defendant argues that the circuit court failed to consider certain nonstatutory mitigating factors that would preclude imposition of the death penalty. Defendant argues that the circuit court failed to consider, *inter alia,* that defendant confessed to the police, pleaded guilty, showed great remorse, was youthful at the time of the crime, and suffered chronic alcoholism from his adolescence to the time of the murders.

We reject defendant's argument. The fact that a court expressly mentions a factor in mitigation does not mean the court ignored other factors. *People v. Burrows*, 148 Ill. 2d 196, 254-56 (1992). The mere existence of mitigating evidence does not preclude imposition of the death penalty. *People v. Johnson*, 149 Ill. 2d 118, 151 (1992); *People v. Thompkins*, 121 Ill. 2d 401, 452 (1988). We presume that the circuit court considered any mitigating evidence before it, in the absence of some indication to the contrary, other than the sentence itself. See, *e.g., People v. Cagle*, 277 Ill. App. 3d 29, 32 (1996); *People v. Young*, 250 Ill. App. 3d 55, 65 (1993).

In the instant case, the circuit court expressly noted two statutory factors in mitigation: (1) extreme mental and emotional disturbance, and (2) no significant criminal history. This, however, does not mean that the circuit

court ignored nonstatutory mitigating factors. The circuit court stated that it would consider mitigating evidence presented in the presentence report and the report by the mitigation specialist. The circuit court stated that it would review all the evidence presented during the course of the proceedings, which included defendant's psychiatric records and records concerning defendant's attempt at alcohol rehabilitation. See *Burrows*, 148 Ill. 2d at 254-56. In addition, when imposing sentence, the circuit court commented on defendant's youth, his history of alcohol abuse, his remorse, and his troubled life. Many of the factors listed by defendant were therefore expressly noted by the circuit court. Accordingly, we reject defendant's argument.

## VIII. Excessive Sentence

Next, defendant argues that his death sentence was excessive. He argues that he presented mitigating evidence of chronic alcoholism and his youth. Defendant argues that he acted under an alcoholic haze of confusion on the night of the crimes. He also claims that neither of his two codefendants received the death penalty. Thus, he argues that the death sentence is excessive.

In reviewing the death penalty, we consider the "character and record of the individual offender and the circumstances of the particular offense." *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976). A death sentence is appropriate if the sentence is commensurate with the seriousness of the offenses and based on an adequate consideration of the relevant mitigating circumstances. *People v. Pitsonbarger*, 142 Ill. 2d 353, 388 (1990). Generally, this court will not interfere with a trial court's determination of sentence unless the trial court has abused its discretion. See, *e.g.*, *People v. Ward*, 154 Ill. 2d 272, 338 (1992); *People v. Gonzalez*, 151 Ill. 2d 79, 89 (1992). A capital sentencer's decision will not be lightly overturned when

amply supported by the record. *People v. Johnson*, 146 Ill. 2d 109, 145 (1991).

In the instant case, the circumstances surrounding the commission of the murders constituted strong aggravating evidence. Defendant shot and killed two defenseless, elderly individuals, who had invited him into their home. Defendant was offered money to commit the killings. After being invited into the home, defendant shot Frank Gorzelanny in the head in an execution-style manner. Defendant then ruthlessly shot Evelyn Gorzelanny twice in the head. After the shootings, defendant acted in a deliberate manner to dispose of clothing and other possible evidence and to give the appearance of a burglary. There was no indication that defendant was acting under the influence of alcohol at the time of the killings. These circumstances show that defendant acted in a planned and calculated manner. See *Pitsonbarger*, 142 Ill. 2d at 388-92 (alcohol problem and troubled childhood were not sufficient to preclude imposition of death penalty based on cold-blooded, close-range shooting of victims during home invasion); *People v. Gosier*, 145 Ill. 2d 127, 146-49 (1991) (insignificant criminal history and drug addiction were not sufficient to preclude imposition of death sentence based on aggravating evidence showing planning and premeditation). Although the circuit court considered mitigating evidence, the circuit court was justified in finding that such evidence was not sufficient to preclude imposition of the death penalty when balanced against the aggravating evidence.

IX. Constitutionality of Aggravating Factor

Defendant next argues that one of the statutory aggravating factors applied during sentencing is unconstitutional. The circuit court found that defendant was eligible for the death penalty under four statutory aggravating factors: (1) multiple murder (720 ILCS 5/9—1(b)(3) (West 1994)), (2) contract murder (720 ILCS 5/9—

1(b)(5) (West 1994)), (3) murder during the course of another felony (720 ILCS 5/9—1(b)(6) (West 1994)), and (4) cold, calculated, and premeditated murder (720 ILCS 5/9—1(b)(11) (West 1994)). Defendant argues that the cold, calculated and premeditated factor is unconstitutionally vague. Although defendant concedes that the other factors were sufficient to support eligibility, defendant argues that the circuit court's consideration of this factor at the aggravation/mitigation phase of sentencing deprived him of a fair sentencing hearing. See U.S. Const., amends. VIII, XIV; Ill Const. 1970, art. I, § 11.

The statutory aggravating factor challenged by defendant applies where "the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 720 ILCS 5/9—1(b)(11) (West 1994). This court has previously determined that this aggravating factor is not unconstitutionally vague. See *People v. Haynes*, 174 Ill. 2d 204, 254-56 (1996); *People v. Williams*, 173 Ill. 2d 48, 89-91 (1996); *People v. Munson*, 171 Ill. 2d 158, 190-92 (1996); *People v. Johnson*, 154 Ill. 2d 356, 372-73 (1993). This court has also rejected defendant's argument that this factor fails to limit a sentencer's discretion and is somehow improper at the second stage of sentencing. *Munson*, 171 Ill. 2d at 191. We decline to reconsider the reasoning of those cases.

## X. Constitutionality of Death Penalty Statute

Finally, defendant argues that the death penalty statute is unconstitutional. Defendant argues that it unconstitutionally places a burden of proof on a defendant because it requires a determination that there are no mitigating factors sufficient to preclude imposition of the death sentence. Defendant also argues that the statute is

unconstitutionally vague because it allows the sentencer to consider any non-statutory aggravating and mitigating factors relevant to imposition of the death penalty. Defendant therefore argues that the statute results in the imposition of arbitrary death sentences.

This court has repeatedly rejected these arguments. This court has held that the statute does not place a burden of proof on a defendant. See, *e.g.*, *Pitsonbarger*, 142 Ill. 2d at 408; *People v. Bean*, 137 Ill. 2d 65, 138-40 (1990). This court has also held that the statute is not unconstitutional because it allows the sentencer to consider non-statutory aggravating factors at the aggravation/mitigation phase of sentencing. See, *e.g.*, *People v. Rissley*, 165 Ill. 2d 364, 407 (1995); *People v. Owens*, 102 Ill. 2d 145, 159 (1984). Defendant raises no compelling argument for reconsideration of these cases.

## CONCLUSION

For the foregoing reasons, the decision of the circuit court is affirmed. The clerk of this court is directed to enter an order setting Wednesday, January 13, 1999, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1996). The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*