NOTICE

Decision filed 06/16/20. The text of this decision may be changed or corrected prior to the filing of a Petiion for Rehearing or the disposition of the same.

2020 IL App (5th) 160135-U

NO. 5-16-0135

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Alexander County. |
| | ) | |
| v. | ) | No. 10-CF-17 |
| | ) | |
| WILLIE M. WILLIAMS, | ) | Honorable |
| | ) | Mark H. Clarke, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court substantially complied with Rule 402 when the court admonished defendant prior to accepting his guilty plea. We affirm the court's order finding defendant fit to stand trial and subsequently denying defendant's motion to withdraw guilty plea and vacate sentence where the record demonstrates an affirmative exercise of judicial discretion in determining defendant's fitness.

¶ 2    Defendant, Willie M. Williams, pled guilty to home invasion and was sentenced to 29 years in the Illinois Department of Corrections (IDOC). The circuit court denied his subsequent motion to withdraw his guilty plea and vacate sentence. On appeal, defendant argues that the court (1) failed to properly admonish him pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 2012) and (2) erred in denying his motion to set aside his guilty plea and vacate sentence. We affirm.

¶ 3                                    I. Background

¶ 4      On April 22, 2010, defendant was charged by information with home invasion (count I) (720 ILCS 5/12-11(a)(2) (West 2010)) for knowingly and without authority entering the home of his victim, Callie Callahan, an individual 60 years of age or older, on April 20, 2010, where he intentionally caused her bodily injury by striking her about the head with his fist. Defendant was also charged with theft over $300 (count II) (*id.* § 16-1(a)(1)(A)) for knowingly exerting unauthorized control over a 32-inch Sanyo flat screen television, valued in excess of $300, belonging to Callahan, an individual 60 years of age or older, with the intent to permanently deprive her of the use of the property. On September 15, 2010, following Callahan's death, defendant was charged with three counts of first degree murder (counts III, IV, V) (*id.* § 9-1(a)(3), (a)(2), (a)(3)), which alleged that the defendant caused Callahan's death by hitting her about the head with his fist during the April 20, 2010, incident.

¶ 5      On May 12, 2011, Attorney Timothy Capps filed a motion to appoint an expert to evaluate defendant's fitness to stand trial. In support, Attorney Capps asserted that he had a *bona fide* doubt as to defendant's fitness, due to defendant's display of impulsive, even volatile, behavior, and his inability to properly follow explanations of legal issues important to his defense. The circuit court subsequently granted this motion and appointed Dr. Michael Althoff, a forensic psychologist, to tender a report regarding defendant's fitness to stand trial. Attorney Capps later mailed defendant a letter detailing his opinion that defendant was "incapable of participating in [his] own defense[,] [which was] reinforced by every tangible and abusive communication you direct my way."

¶ 6      Following Dr. Althoff's June 22, 2011, fitness evaluation report, the circuit court held a fitness hearing on August 18, 2011. According to Dr. Althoff, he had "attempted" to see

2

defendant at Tri-County Detention Center (Tri-County) but was unable to conduct an in-person interview or examination on June 17, 2011. Instead, Dr. Althoff based his findings on correspondence with Attorney Capps; court documents; two activities of daily living questionnaires provided by defendant's two sisters, which showed defendant suffered from hallucinations, had trouble sleeping, and experienced periods of anger; incident reports and staff correspondence at Tri-County, which showed defendant engaged in very disruptive behavior; and prior mental health evaluations from October 2003, September 2004, April 2006, and June 2006.

¶ 7 Dr. Althoff diagnosed defendant with bipolar disorder, most recent episode manic; antisocial personality disorder, borderline intellectual functioning; diagnosis deferred to primary physician and incarceration and pending litigation. Dr. Althoff's report confirmed Attorney Capps' belief that defendant was incapable of participating in his own defense, based on "[t]he degree of disruptiveness in the defendant's behavior, which is consistent with mood variability, translates into clear problems with difficulty in relating to counsel in order to assist in his own defense." At the conclusion of the hearing, the circuit court found defendant unfit to stand trial and remanded him to the custody of the Illinois Department of Human Services (DHS) for treatment.

¶ 8 On December 20, 2011, the circuit court held a fitness review hearing. Defendant's treating physician, Dr. Prithviraj Thakur, coordinating therapist, Joan Fisher, MSW, SWI, and interim hospital administrator, Melissa Gross, all employees of DHS, agreed that defendant was still unfit to stand trial. The prosecuting attorney and Attorney Capps stipulated to the fitness evaluation produced by DHS and set another hearing within 90 days to review defendant's progress. When questioned by the court as to how defendant would regain fitness, Attorney

Capps responded: "I think the answer is going to be at some point he's either going to respond to the medication to where he's not what he was before or he's not ***."

¶ 9     On February 2, 2012, Dr. Thakur submitted a fitness report to the circuit court. Dr. Thakur reported that defendant was fit to stand trial provided "[d]efendant maintain the following psychiatric treatment: the drug Olanzapine 20 mg. at bedtime every night, and the drug Lorazepam 2 mg. twice a day," with Tri-County personnel to "make the necessary observation to ensure that the Defendant does, in fact, swallow said medication."

¶ 10    On March 29, 2012, the circuit court held a restoration hearing. Consistent with his February 2, 2012, fitness report, Dr. Thakur testified that defendant had been voluntarily taking court-ordered psychotropic medication, specifically, olanzapine for psychosis and tab lorazepam for agitation and anxiety. As of November 28, 2011, defendant "no longer approached in a threatening manner and his mood was less agitated (50%)." Dr. Thakur provided subsequent dates where he continued to observe defendant's improved behavior while taking the court-ordered medication. Specifically, on his last observation of defendant, Dr. Thakur noted that defendant was "pleasant, cooperative and many times said that he was ready to go back to the court and cooperate with his attorney." Dr. Thakur also described defendant as willing to continue to take medication while in jail because defendant specifically expressed that "[m]edicine makes me smile. I have stopped yelling, screaming and throwing tantrums." Lastly, Dr. Thakur testified that defendant had been restored to fitness to stand trial and would be able to cooperate and assist in his own defense. Specifically, Dr. Thakur stated that, although defendant was suffering from bipolar disorder with psychotic features, it was "almost controlled (80-90%) with psychotropic medication and other treatment." At the conclusion of the hearing, the court found defendant fit to stand trial and remanded him from DHS to the custody of Tri-County.

4

¶ 11    On September 17, 2012, defendant filed a motion to suppress his statements made to police following the home invasion. In support, defendant asserted that any waiver of rights was not knowing and voluntary because he suffered "mental longstanding; untreated mental illness that has been the subject of previous litigation in the above-captioned case." Shortly thereafter, defendant filed a *pro se* motion to dismiss Attorney Capps as his legal counsel, asserting that Attorney Capps had failed (1) to set forth an appropriate legal performance and (2) notify the circuit court of evidence against the State.

¶ 12    On November 19, 2012, the circuit court held a hearing on defendant's *pro se* motions to suppress statements and dismiss Attorney Capps. When addressed by the court, defendant stated that Attorney Capps was "trying to threaten me. I'm tired of being threatened about some medication." In response, Attorney Capps stated he had a *bona fide* doubt regarding defendant's fitness to stand trial because defendant had stopped taking his medication in May 2012. Because medical opinions regarding defendant's fitness to stand trial depended on his willingness and continuation of medicine, Attorney Capps believed the defendant was unfit, primarily because Tri-County had been unable to ensure he took the court-ordered medication. Attorney Capps stated the following:

> "I don't know if we have to reopen the whole issue of fitness since he's already been found unfit *** but restored to fitness with the condition that he take his medicine. I don't know that we have to start the whole ball rolling again or if we can proceed directly to a remedy of getting Mr. Williams stabilized and returned to fitness, and then we can address how we're going to make sure he's taking his medicine."

In response, the State specified that this case "all gets down to [whether] this defendant can remain fit for trial if he takes his mediation. He's not taking his mediation. *** [S]o, yes, I believe there is a *bona fide* doubt of the defendant's fitness." The circuit court concluded that an

5

appropriate examination was required. The court removed the case from its setting and ordered the attorneys to "get together and see if they can agree on who should make that examination."

¶ 13 December 17, 2012, Attorney Capps filed a memorandum of law concerning defendant's fitness to stand trial. Attorney Capps discussed the complexity of defendant's case, proposing one of two options to move forward, including: (1) request Dr. Thakur to testify whether defendant's relapse into unfitness is the expected result of not being medicated and whether readmission to DHS would be an appropriate measure to restore defendant's fitness, or (2) begin the fitness determination from scratch with a new examination by Dr. Althoff.

¶ 14 On January 23, 2013, Attorney Capps filed a second motion to appoint expert and determine defendant's fitness to stand trial. In support, Attorney Capps, again, expressed a *bona fide* doubt as to defendant's fitness, based on defendant's inability to meaningfully cooperate with counsel and participate in his own defense. Without objection, the court appointed Dr. Althoff to conduct a fitness evaluation.

¶ 15 Dr. Althoff's subsequent report, dated February 27, 2013, provided a detailed chronology of defendant's mental health treatment while in the custody of DHS. Since defendant's noncompliance with medication had started, Dr. Althoff indicated that "the signs and symptoms indicating disorders in his mood, thinking processes and behavior *** have returned." Although Dr. Althoff was unable to personally interview defendant, he reviewed several past records and evaluations before concluding that defendant was unfit. Dr. Althoff believed restoration of defendant's fitness could be met within the statutory period of time with ongoing medicine compliance.

¶ 16 On March 20, 2013, the circuit court held a fitness hearing and, again, found defendant unfit to stand trial. In so ruling, the court relied on Dr. Althoff's February 27, 2013, report that

6

detailed defendant's noncompliance with taking medication, which resulted in defendant's behavioral and mood issues. Defendant was ordered to undergo treatment and remanded to DHS for placement in a secure inpatient setting.

¶ 17   On June 17, 2013, the circuit court held a fitness review hearing. Defendant's treating physician, Dr. Muddasani Reddy, coordinating therapist, Shirley Shaw, MSW, SWII, and the hospital administrator of Chester Medical Health Services Center (Chester Medical), all agreed that defendant was unfit to stand trial. Dr. Reddy noted that it was likely for defendant to achieve fitness within one year from the original date of unfitness with treatment. The court ordered DHS to submit a progress report regarding defendant's medications and the clinical findings and opinion of defendant's treating physician as to whether defendant had attained fitness or was making progress, with treatment, to attain fitness within one year of the date of the original finding of unfitness.

¶ 18   After receiving a progress report, dated August 22, 2013, indicating that defendant had been restored to fitness, the circuit court held a restoration hearing on September 11, 2013. Although Attorney Capps believed defendant had "markedly improved," he disagreed with the treating physician's finding that defendant had attained fitness. As such, the court, on Attorney Capps' motion, determined that good cause existed not to hold the hearing that day. Accordingly, the court continued the hearing, leaving defendant's status as unfit. The court ordered defendant to remain in DHS custody for continued treatment until the next setting.

¶ 19   On October 11, 2013, the circuit court held a follow-up restoration hearing. At the hearing, Dr. Mary Hanessian, defendant's treating psychiatrist at Chester Medical for approximately two months, testified to the following. Dr. Hanessian found defendant to be "consistently stable since [she] took over his care." Defendant voluntarily took a daily dose of 20

7

milligrams of olanzapine and "actually continued to improve and show good insight and self-control." Moreover, to ensure compliance, Dr. Hanessian stated that defendant's nurse put olanzapine in liquid, and "we watch him take it. We've had no refusals. He's taking it voluntarily." Dr. Hanessian further stated that there had been no reports of defendant throwing up the medication. Instead, "his conduct and his demeanor and his sociability has been excellent. *** [W]e really believe he's taking it," especially since his mental status had deteriorated in the past when he failed to take medication.

¶ 20    Dr. Hanessian testified that defendant was thoughtful, well-spoken, and had much clearer and organized thought processes when medicated. In fact, she stated that it "is a pleasure to care for him." In comparison, Dr. Hanessian testified that when defendant was not medicated in the past, he was "argumentative," "antagonistic," and generally appeared paranoid, confused, and irritable. Dr. Hanessian testified that defendant was fit to stand trial at the time of her report and on the day of the fitness hearing.

¶ 21    Following Dr. Hanessian's testimony, the circuit court addressed defendant. The following colloquy took place:

> "THE COURT: Mr. Williams, we've spent a fair amount of time listening to the doctor talk about you. Do you feel that you understand the proceedings that we're at here today?
> MR. WILLIAMS: Yes, sir.
> THE COURT: Can you tell me what we're doing here today?
> MR. WILLIAMS: Having a fitness stand for me.
> &ast; &ast; &ast;
> THE COURT: *** How are you getting along with Mr. Capps?
> MR. WILLIAMS: Fine. I'd like for him to continue to be my attorney.
> THE COURT: And do you believe that in your discussions with Mr. Capps, you are formulating a plan for dealing with the charges that the [S]tate has made in this case?
> MR. WILLIAMS: Yes, we are.
> THE COURT: And you understand that you have the right to persist in your plea of not guilty to these charges and have a trial, do you understand that?
> MR. WILLIAMS: Yes, sir.
> &ast; &ast; &ast;

THE COURT: Can you tell me the function of a jury if a jury is empaneled here?

MR. WILLIAMS: Yes. The jury would be *** to determine my innocence or guilt.

THE COURT: And can you tell me what my job would be?

MR. WILLIAMS: Your job is to proceed over the proceedings.

* * *

THE COURT: You have the right to plead guilty or plead not guilty, and that decision is yours and yours alone. Do you understand that?

MR. WILLIAMS: Yes, I do.

THE COURT: And if you were to plead not guilty, we would have the trial, and if you were to plead guilty, you understand that hearings would follow from that?

MR. WILLIAMS: Yes.

THE COURT: And can you tell me?

MR. WILLIAMS: We have plea, possibility of a plea.

THE COURT: Okay, and then what would be my job if you were to plead guilty?

MR. WILLIAMS: It's to determine whether or not you first of all want to accept it.

THE COURT: Okay.

MR. WILLIAMS: And if you choose to accept it, the parties *** go to a plea agreement.

* * *

THE COURT: Can you tell me what my job would be at the sentencing hearing?

MR WILLIAMS: It's to determine what's called a pre-investigative report, and all the other evidence to determine whether or not what sentence I should be given.

THE COURT: *** Do you feel that you are getting the opportunity to speak with Mr. Capps as necessary now?

MR. WILLIAMS: Yes, I do."

The State then called Brian Foster, an administrator for Chester Medical, who agreed to house defendant for 30 days for the purposes of maintaining his fitness to stand trial. The State then concurred with Dr. Hanessian's fitness determination and stipulated to the contents of her report. Attorney Capps agreed with the State and stated that he had "no reservations whatsoever about Mr. Williams' fitness" based on his interactions with defendant that day. The court subsequently found defendant "fit to assist in his defense and fit to stand trial." The court stated that "defendant is in need of continued care or treatment" at Chester Medical because the "medication that [he] is on is essential to his well-being." The court's written order stated: "Defendant is FIT TO STAND TRIAL provided that Defendant maintain the following

9

psychiatric treatment: the drug Olanzapine 20 mg. at bedtime every night." (Emphasis in original.)

¶ 22    After finding defendant fit to stand trial, the judge allowed a brief recess for Attorney Capps and defendant to confer before the guilty plea hearing later that morning. During the guilty plea hearing, the court asked defendant if he understood the ramifications of his decision to plead guilty, which included that he would not have a trial, he would give up his right to a trial, there would be no jury empaneled or judge assigned to hear evidence, and he would give up his right to question and present witnesses. Defendant understood. After defendant acknowledged that he was satisfied with Attorney Capps' performance, the court asked defendant if he wished to proceed with the presentation of the plea agreement, to which he responded: "Yes, I do."

¶ 23    The State then explained the specifics of the plea agreement:

> "[T]he defendant is going to plead guilty to Count I of the original information, filed April 22, 2010, that being a Class X felony of home invasion. He will do so in an open plea setting. Any remaining counts will be dismissed. We will ask that it be set for sentencing hearing. Within that information, the [S]tate has alleged the age of the victim being an aggravating factor which makes the defendant eligible for extended term pursuant to the statute which is cited on the face of the charge, and the [victim's] age being cited within the charge."

Following the State's presentation, the circuit court asked defense counsel: "Is that the agreement, Mr. Capps?" Attorney Capps responded in the affirmative.

¶ 24    The circuit court then addressed defendant to explain what an open plea meant and whether he understood. Defendant responded in the affirmative. The court asked defendant if anyone had promised him a particular outcome at the sentencing hearing, to which he responded: "No, they haven't." Next, the court explained the nature of the charge before it asked defendant: "Do you understand what you're pleading guilty to, sir? Defendant answered: "Yes, sir." Next,

10

the court explained the sentencing range for the Class X felony, which does not allow for probation, and the extended term sentencing range. Defendant stated that he understood and then acknowledged that he did not have any questions about the sentencing range or maximum possible penalty for the offense. The court then asked defendant if he had been threatened or promised anything to plead guilty. Again, defendant stated no. Defendant stated he was pleading guilty on his own free will. The trial judge then asked defendant if he "understood what you're doing today." Defendant responded that he understood and that he had enough time to speak with his attorney about his open plea. Defendant subsequently pled guilty to the charge.

¶ 25    In addition to in-court discussions, defendant signed a written guilty plea, dated October 11, 2013, which provided as follows:

> "I, the undersigned defendant, hereby voluntarily, knowingly and understandingly enter a plea of guilty to: [count I] - home invasion \*\*\*. I understand that by pleading guilty, I am giving up my right to trial, including my right to a jury trial. I am also giving up my right to confront witnesses and to subpoena witnesses on my behalf. I understand the nature of the offense and the possible penalties. I understand that if I plead guilty, the Court may sentence me up to the maximum penalty provided for this offense without hearing witnesses or having a trial. No threats have been made to get me to plead guilty.
>     **Negotiated Plea**. This plea is entered pursuant to an agreement between the prosecutor and the defendant under Illinois Supreme Court [R]ule 403(d) which contemplates a specified sentence will be imposed and/or that other charges before the Court will be dismissed. The parties request the Court's affirmance of the agreement. I understand that if the Court does not concur in the agreement or withdraws concurrence, I may withdraw this plea of guilty. If the Court does not concur, I may persist in my plea of guilty and the disposition may be different than that contemplated by the plea agreement and that the Court may impose any sentence up to the maximum provided for the offense. Other than the plea agreement, no other promises have been made to me to cause me to enter this plea." (Emphasis in original.)

The "negotiated plea" box was checked, but the box below it pertaining to promises was not checked where it stated: "No promises have been made to me concerning a specific sentence or reduction and/or dismissal of charges. I understand the Court may sentence me up to the

maximum penalty provided by the law." The court accepted defendant's plea of guilty, finding it knowing and voluntary, and then ordered a presentence investigation.

¶ 26    On November 12, 2013, the circuit court held the sentencing hearing. At the beginning of the hearing, the court stated: "Before we go further, I'd like to check the status of Mr. Williams' ability to communicate with defense counsel and to prepare for the proceedings." Attorney Capps stated that defendant seemed to be "alert, coherent, as easy to deal with, as capable of understanding everything that's going on as he ever has been during these proceedings." Attorney Capps further stated: "I am confident that he is completely fit to proceed to sentencing." The court further confirmed Capps' opinion by addressing defendant in open court. Specifically, the court asked defendant if he had time to speak with Attorney Capps, whether he had been able to discuss his thoughts and concerns with counsel, and whether Attorney Capps had responded. Defendant responded in the affirmative and voiced his desire to proceed to sentencing.

¶ 27    Prior to imposing sentence, the circuit court admonished defendant of his appeal rights. The court also admonished the defendant that he would have to file a motion to withdraw his guilty plea prior to an appeal, and, if allowed, any charges dismissed as part of the plea agreement could be reinstated. Before the State presented any evidence in aggravation, Attorney Capps, for purposes of clarity, filled out a new written guilty plea form because the "negotiated plea" box had been checked, but the box where it stated "[n]o promises have been made to me concerning a specific sentence or reduction and/or dismissal of changes. I understand the Court may sentence me to the maximum penalty provided by law" had not been checked. On the record, the following colloquy took place:

"THE COURT: Mr. Williams, your attorney had checked the box that he checked because he was reading the language in that paragraph that other charges before the court will be dismissed. That's correct?

MR. WILLIAMS: Yes.

THE COURT: Other charges against you have been dismissed as part of this plea agreement. The box regarding no promises have been made to you concerning a specific sentence or reduction and I'm now striking for purposes of clarity and/or dismissal of charges because they did promise you they were going to dismiss the charges, and they have, in fact, dismissed charges.

ATTORNEY CAPPS [(DEFENSE COUNSEL)]: Yes, your honor.

THE COURT: *** The reason for the desire to be clear, Mr. Williams, is because this is a serious case. *** Do you understand?

MR. WILLIAMS: Yes, sir."

Subsequently, the court offered defendant additional time to converse with Attorney Capps before the court proceeded to sentencing. Defendant stated he was ready to proceed.

¶ 28    After the State presented evidence in aggravation, Attorney Capps asked the circuit court to take judicial notice of the presentence investigation report and Dr. Hanessian's testimony. Before the court's sentencing, Attorney Capps, in addressing defendant's mental health issues, stated the following:

"The court from its own observations can look at Mr. Williams sitting next to counsel today and sitting here calmly, peacefully, and I ask the court to cast its mind back to earlier hearings when Mr. Williams was so unruly and abusive that he was not able to even be in the courtroom for his proceedings.

* * *

And if you look at him today, and if you look at him before he was correctly medicated, we're looking at two totally different people."

Following defendant's statement in allocution, the court stated the following:

"This case has been going on in this courtroom since April of 2010, and during the many times the defendant has been in this courtroom, I have had the opportunity to observe him, his manner, his mood, listened to his words, see his interactions with other individuals, and I do agree with Mr. Capps that the difference in Mr. Williams when he's on medication and the medication has had time to do what the medication does, and when Mr. Williams has not been on his medication is staggering. It's dramatic. It is—makes an impression."

The court proceeded to sentence defendant to 29 years in IDOC.

13

¶ 29    On December 5, 2013, defendant filed a *pro se* motion to withdraw guilty plea and vacate sentence and notice of appeal. Because defendant's motion to withdraw guilty plea and vacate sentence had not yet been ruled on before he filed the notice of appeal, the circuit court found defendant's notice of appeal "moot," reappointed counsel, and ordered a hearing set for defendant's *pro se* motion to withdraw guilty plea and vacate sentence.

¶ 30    On March 24, 2014, Attorney Capps filed a motion to withdraw, which the circuit court granted, and Attorney Patrick Duffy entered his appearance. Shortly thereafter, Attorney Duffy filed a motion for a fitness examination. The circuit court later granted the motion and appointed Dr. William Donaldson to evaluate defendant.

¶ 31    On September 4, 2014, Dr. Donaldson submitted his report, which found defendant unfit. Following a fitness hearing on September 8, 2014, the circuit court found defendant unfit. The court entered its written order on January 5, 2015, finding defendant unfit and ordering defendant to be placed in the custody of DHS for treatment in a secure inpatient setting for purposes of rendering him fit. The court noted it was unable to determine whether there was a substantial probability that defendant, if provided with a course of treatment, would attain fitness within one year. The court ordered defendant's treating supervisor to submit a progress report within 30 days addressing the probability of defendant attaining fitness within one year.

¶ 32    On December 9, 2014, defendant filed a *pro se* notice of appeal with this court. Subsequently, because defendant's December 5, 2013, *pro se* motion to withdraw guilty plea was still pending, Attorney Duffy filed a motion to dismiss the appeal as untimely. Defendant's notice of appeal was later dismissed.

¶ 33    Attorney Susan Burger was then substituted for Attorney Duffy as defense counsel. Attorney Burger entered her appearance on July 31, 2015.

14

¶ 34 On September 11, 2015, Attorney Burger filed a motion to vacate the circuit court's January 5, 2015, fitness order, stating that it appeared from the court's order that it had failed to exercise its discretion by conducting an analysis of Dr. Donaldson's opinion before it found defendant unfit. Attorney Burger also filed an amended motion to withdraw guilty plea and vacate sentence, arguing that (1) defendant's timely December 5, 2013, motion to withdraw guilty plea and vacate sentence had never been heard; (2) the court had failed to exercise its discretion in entering a "conditional fitness" determination on October 11, 2013; (3) Attorney Capps was ineffective; and (4) the court lacked authority to order defendant to take psychotropic drugs. Moreover, Attorney Burger asserted that "defendant became so passive that he actually went along with an **open plea**, that could not have been in his best interest," so "[d]efendant immediately realized this, and filed his timely motion to withdraw his guilty plea and to vacate the sentence." (Emphasis in original.)

¶ 35 On September 15, 2015, following a status hearing, the circuit court entered an order directing DHS and IDOC to arrange for defendant's placement in a facility where he would receive the necessary treatment to attain fitness. The court also ordered DHS to provide a report detailing defendant's medication and the treating supervisor's clinical findings and opinion regarding whether defendant had attained fitness or was making progress toward the goal of attaining fitness within one year. Shortly thereafter, defendant was transferred to Chester Medical for treatment.

¶ 36 On December 3, 2015, following a restoration hearing on November 12, 2015, the circuit court, relying on the most recent report by defendant's treating physician, Dr. Rajendra Gupta, found defendant fit. During the hearing, the court asked defendant a list of questions, which included what actions defendant would have to take if allowed to withdraw his guilty plea.

Defendant indicated that he would have to assist Attorney Burger with his defense if he went to trial, which, according to him, was the avenue he wanted to originally pursue. He also understood that the first degree murder charges could be reinstated if he withdrew his guilty plea. Moreover, defendant stated that he had stopped taking his medication after he left court following his guilty plea. The court set defendant's postconviction motions for hearing on December 23, 2015.

¶ 37     On December 11, 2015, Attorney Burger filed a second amended motion to withdraw guilty plea and vacate sentence, asserting the following: (1) the circuit court abused its discretion in entering a "conditional fitness" order, finding defendant fit provided he took olanzapine; (2) Attorney Capps did not advise defendant of the court's error in finding defendant only " 'conditionally fit,' " thus he was ineffective, given defendant was found fit and pled guilty to a Class X felony on the same day; (3) the court recognized defendant could turn his fitness on and off; (4) defendant had informed the court at multiple prior hearings that he had stopped taking the prescribed medication; and (5) defendant's sentence was excessive.

¶ 38     On December 16, 2015, the State argued in response that the circuit court's order was not conditional on defendant's continued use of medication. Rather, the State asserted that the court's factual basis for finding defendant fit was greatly supported by the record. Specifically, the State stated that defendant's use of medication was voluntary at the time of the plea and sentence, and he had demonstrated a knowing and voluntary choice to plead guilty throughout the fitness, guilty plea, and sentencing hearings. Moreover, the State argued Attorney Capps' representation met the standard of an objectively reasonable attorney, and defendant's sentence was not excessive, given it was well within the required sentencing range.

16

¶ 39    On December 23, 2015, following a hearing, the circuit court denied defendant's second amended motion to withdraw guilty plea and vacate sentence and remanded defendant to the custody of IDOC. Specifically, the court, in addressing defendant's argument of conditional fitness, stated that the order "should not have been phrased that way, because it is subject to interpretation in a problematic way" when it stated "the Defendant is FIT TO STAND TRIAL provided that Defendant maintain the following psychiatric treatment: the drug Olanzapine 20 mg. at bedtime every night." The court further stated that this specific language was "unnecessary," because "it's *** qualifying language that is not essential to the Court's ruling."

¶ 40    In addressing *People v. Jones*, 349 Ill. App. 3d 255 (2004), the circuit court stated that in using this specific language, its "clear intent was to incorporate the findings of the experts in the Court's ruling," which was that defendant's "status as fit could change if he didn't take his medicine." In distinguishing the present case to *Jones*, the court noted that it used the above language because defendant had been found fit before and then stopped taking his medication several times, and each time, Attorney Capps, "when confronted with the change that happened to the Defendant, brought the matter to the attention of the Court." The court concluded that defendant was fit when he entered his guilty plea and at the time of sentencing.

¶ 41    In the circuit court's January 5, 2016, written order, it admitted error when it included the specific language, "provided that Defendant maintain the following psychiatric treatment: the drug Olanzapine 20 mg. at bedtime every night," in its fitness order. Although error, the court determined the "language was not necessary to support this Court's finding that Defendant was fit to stand trial," but was rather "immaterial, because it constituted a mere reference to a contingency which never manifested itself ***." The court stated that, after having reviewed the record, it believed the record affirmatively showed a sufficient basis for the court's finding of

17

fitness, unlike *Jones*, and that defendant was in fact fit when he entered his guilty plea and at sentencing. Moreover, the court determined that (1) it had authority to order defendant to undergo treatment for the purposes of rending him fit following a finding he was not fit; (2) it had authority to order continued care and treatment after finding defendant fit, and if defendant refused psychotropic medications, it may be administered over defendant's objection; (3) Attorney Capps was not ineffective; and (4) defendant had entered a knowing and voluntary guilty plea after assessing defendant's credibility. Defendant filed a timely notice of appeal.

¶ 42                                    II. Analysis

¶ 43                              A. Plea Admonishments

¶ 44    Defendant argues his guilty plea should be vacated where the circuit court failed to properly admonish him prior to acceptance of his guilty plea, as required under Illinois Supreme Court Rules 402(a) and (b) (eff. July 1, 2012), by failing to admonish him that he had the right to plead not guilty or to persist in that right; ask him if he had been forced to plead guilty; and confirm the terms of the plea agreement with him in open court. In response, the State argues the court "substantially, if not fully, complied" with the required admonishments before defendant pled guilty.

¶ 45    We begin by noting that defendant failed to properly raise this issue before the circuit court. Generally, under Illinois Supreme Court Rule 604(d) (eff. Mar. 8, 2016), any issue not raised by a defendant in his motion to withdraw guilty plea shall be deemed forfeited on appeal. *People v. Williams*, 2012 IL App (2d) 110559, ¶ 12. However, the alleged failure to provide proper admonishments under Rule 402 may be, and routinely is, reviewed for plain error under Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967). *People v. Fuller*, 205 Ill. 2d 308, 322-23 (2002); *Williams*, 2012 IL App (2d) 110559, ¶ 12. " 'Before invoking the plain error exception,

18

however, we determine whether any reversible error occurred.' " *Fuller*, 205 Ill. 2d at 323 (quoting *People v. Chapman*, 194 Ill. 2d 186, 226 (2000)).

¶ 46    Pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 2012), every defendant who enters a plea of guilty has a due process right to be properly and fully admonished. *People v. Whitfield*, 217 Ill. 2d 177, 188 (2005). The goal of Rule 402 is to ensure that a defendant understands his plea, the rights he has waived, and the consequences of his actions. *People v. Dougherty*, 394 Ill. App. 3d 134, 139 (2009) (citing *People v. Johns*, 229 Ill. App. 3d 740 (1992)). The rule requires "substantial, not literal, compliance with its provisions." *People v. Krantz*, 58 Ill. 2d 187, 192 (1974) (citing *People v. Mendoza*, 48 Ill. 2d 371, 373-74 (1971)). " 'Substantial compliance' means that although the trial court did not recite to the defendant, and ask defendant if he understood, all the components of Rule 402(a), the record nevertheless affirmatively and specifically shows that the defendant understood them." *Dougherty*, 394 Ill. App. 3d at 138 (citing *People v. Walker*, 109 Ill. 2d 484, 499 (1985)). Illinois courts have found substantial compliance with Rule 402 where the record indicates a defendant understandably and voluntarily entered his plea, even if the circuit court failed to admonish defendant as to a specific provision. *Id.* (citing *People v. Sutherland*, 128 Ill. App. 3d 415, 417 (1984)).

¶ 47    In reviewing admonishments under Rule 402, a court may consider the entire record, including the record of earlier proceedings, in determining whether the accused voluntarily pled guilty. *Id.* at 139 (citing *Krantz*, 58 Ill. 2d at 192). Although the best practice is to give admonishments at the time the circuit court accepts the waiver of the plea, failure to do so is not necessarily fatal. *People v. Dennis*, 354 Ill. App. 3d 491, 497 (2004) (citing *People v. Ray*, 130 Ill. App. 3d 362, 365 (1984)). Rather, each case must be determined on its own peculiar circumstances, with a focus on the length of time between the waiver and plea. *Id.*

19

¶ 48    Failure to properly admonish a defendant does not automatically establish grounds for reversing judgment or vacating a guilty plea. *People v. Davis*, 145 Ill. 2d 240, 250 (1991) (citing *People v. Cohn*, 91 Ill. App. 3d 209, 213 (1980)). Whether reversal is required depends on whether real justice has been denied or whether defendant had been prejudiced by the inadequate admonishment. *People v. Dudley*, 58 Ill. 2d 57, 60-61 (1974). It is the defendant's burden to establish prejudice. *Dougherty*, 394 Ill. App. 3d at 139 (citing *Dudley*, 58 Ill. 2d at 57). A defendant's arguments are subject to *de novo* review. *People v. Dismuke*, 355 Ill. App. 3d 606, 608 (2005).

¶ 49    Here, we recognize that the circuit court did not admonish defendant at the guilty plea hearing of his right to plead not guilty or to persist in a plea of not guilty. With reliance on *People v. Wise*, 26 Ill. App. 3d 158, 161 (1975), defendant argues that the court's failure to admonish him of multiple Rule 402 admonishments, especially his right to plead not guilty and persist in that right, was fatal to his guilty plea. We disagree.

¶ 50    Unlike *Wise*, where there were no prior proceedings in which the defendant was admonished, here, defendant was admonished of this right at the restoration hearing, which occurred on the same morning as the plea hearing. Although best practice is to give admonishments at the time the circuit court accepts a defendant's waiver and plea, we do not believe the timing of the court's admonishment is fatal in this case. See *Dennis*, 354 Ill. App. 3d at 496 (Rule 402(a) substantial compliance existed where "trial court admonished [the defendant] over and over again on those rights, most recently a month before the admission," when court adopted the same admonishment required by Rule 402 for admissions at a probation revocation hearing); see *People v. Sharifpour*, 402 Ill. App. 3d 100, 115 (2010) (circuit court did not err where it did not provide the defendant new admonishments following a "brief" one- to two-hour

20

recess during the plea hearing); *People v. Merritt*, 16 Ill. App. 3d 69, 71-72 (1973) ("Admonishments once set forth in Supreme Court Rule 402 need not be repeated if arraignment is temporarily interrupted."); *People v. Trenter*, 3 Ill. App. 3d 889, 891 (1972) (conference took place later in the day of the arraignment after the defendant indicated he wished to enter into a plea discussion before court accepted defendant's plea of guilty).

¶ 51    Although the restoration hearing on October 11, 2013, was not a plea hearing, we cannot say the admonishment was given wholly outside that context when both proceedings—restoration and plea hearings—were held in tandem on the same day. We recognize the purpose of the restoration hearing was to determine defendant's fitness; however, at the hearing, the following colloquy took place between the court and defendant:

> "THE COURT: Can you tell me what we're doing here today?
> MR. WILLIAMS: Having a fitness stand for me.
> THE COURT: *** How are you getting along with Mr. Capps?
> MR. WILLIAMS: Fine. I'd like for him to continue to be my attorney.
> 　　　　　　　　　　　　　* * *
> THE COURT: And do you believe that in your discussions with Mr. Capps, you are formulating a plan for dealing with the charges that the [S]tate has made in this case?
> MR. WILLIAMS: Yes, we are.
> THE COURT: And you understand that you have the right to persist in your plea of not guilty to these charges and have a trial, do you understand that?
> MR. WILLIAMS: Yes, sir.
> 　　　　　　　　　　　　　* * *
> THE COURT: Can you tell me the function of a jury if a jury is empaneled here?
> MR. WILLIAMS: Yes. The jury would be *** to determine my innocence or guilt.
> THE COURT: And can you tell me what my job would be?
> MR. WILLIAMS: Your job is to proceed over the proceedings.
> 　　　　　　　　　　　　　* * *
> THE COURT: You have the right to plead guilty or plead not guilty, and that decision is yours and yours alone. Do you understand that?
> MR. WILLIAMS: Yes, I do.
> THE COURT: And if you were to plead not guilty, we would have the trial, and if you were to plead guilty, you understand that hearings would follow from that?
> MR. WILLIAMS: Yes.
> THE COURT: And can you tell me?
> MR. WILLIAMS: We have plea, possibility of a plea.

21

THE COURT: Okay, and then what would be my job if you were to plead guilty?

MR. WILLIAMS: It's to determine whether or not you first of all want to accept it.

THE COURT: Okay.

MR. WILLIAMS: And if you choose to accept it, the parties of it let it and go to a plea agreement."

¶ 52 Following the circuit court's fitness determination, a short recess took place before the court conducted defendant's guilty plea hearing later that morning. Considering the recency of the admonishment, we find substantial compliance took place. See *Dennis*, 354 Ill. App. 3d at 496 (contested Rule 402(a) admonishments were given one month before admission and substantial compliance was determined based on the recency and repetition provided by the circuit court). Accordingly, the record affirmatively and specifically shows that defendant understandably and voluntarily entered his plea, and the court's failure to re-admonish defendant did not result in any real injustice or prejudice. Therefore, reversal is unwarranted.

¶ 53 Next, Illinois Supreme Court Rule 402(b) (eff. July 1, 2012) requires the circuit court to have the terms of the plea agreement stated in open court and by questioning the defendant personally: (1) confirm the terms of the plea agreement and (2) determine whether any force or threats or any promises apart from the plea agreement were used to obtain the plea. While we recognize the court did not confirm the terms of the plea agreement with the defendant in open court or question him to determine whether any force was used to obtain his plea, we cannot conclude that reversal is warranted.

¶ 54 A review of the record demonstrates defendant's guilty plea was not the result of any force either during the brief recess or the plea hearing. On October 11, 2013, defendant acknowledged during both hearings that he had the opportunity to speak with Attorney Capps, who had been his defense counsel for nearly two years, and that they had formulated a plan to deal with the charges. Before the guilty plea hearing, defendant and Attorney Capps withdrew

22

during a short recess to specifically consult for purposes of the plea hearing. Moreover, during the plea hearing, defendant acknowledged he was satisfied with Attorney Capps' performance and that he wished to proceed with the presentation of the plea. Although the specific word "force" was not used by the court in its admonishments, the court explicitly asked defendant if he had been "threatened or promised anything to plead guilty." Defendant stated "no." Additionally, defendant acknowledged that he was pleading guilty on his own free will. Accordingly, we cannot find defendant was prejudiced or that real justice has been denied by the court's failure to inquire as to any force, where the record affirmatively demonstrates defendant understandably and voluntarily entered his plea. Therefore, reversal is not required on this basis.

¶ 55    Lastly, defendant asserts that the circuit court's failure to directly address him in open court to confirm the terms of the plea agreement "resulted in Mr. Williams initially understanding that the first-degree murder charges were dismissed *not pursuant to his plea* but independently." (Emphasis in original.) Accordingly, defendant asserts he did not understand the terms of his open plea agreement. We are not persuaded.

¶ 56    Although the State stated the plea agreement in open court, specifically indicating that "[a]ny remaining counts will be dismissed," we recognize that the court failed to ask defendant to personally confirm the terms of the agreement. It does not follow, however, that this Rule 402(b) omission must result in reversal. See *Dudley*, 58 Ill. 2d at 61 (citing *People v. Morehead*, 45 Ill. 2d 326, 332 (1970) ("It is not the policy of this court to reverse a judgment of conviction merely because error was committed unless it appears that real justice has been denied ***.")). Here, a review of the record affirmatively demonstrates defendant understandably and voluntarily entered his plea. First, defendant indicated his satisfaction with Attorney Capps' performance on multiple occasions throughout the proceedings, and prior to entering his guilty

23

plea, the court informed defendant four times that it would provide him additional time to discuss the plea agreement with Attorney Capps before pleading guilty. Defendant declined the court's offers, stating he did not have any concerns about his decision to plead guilty. Moreover, defendant signed a written guilty plea form, dated October 11, 2013, which stated: "This plea is entered pursuant to an agreement between the prosecutor and the defendant under Illinois Supreme Court [R]ule 403(d) which contemplates a specified sentence will be imposed and/or that other charges before the Court will be dismissed." Accordingly, we cannot conclude that defendant was prejudiced or denied real justice as a result of the court's failure to strictly comply with this Rule 402(b) requirement. Thus, reversal is not warranted where the record affirmatively demonstrates defendant understandably and voluntarily entered his plea.

¶ 57                    B. Conditional Fitness Determination

¶ 58    Next, the defendant asserts that the circuit court abused its discretion where the record does not demonstrate an affirmative exercise of judicial discretion when it made a "conditional fitness" determination not authorized by statute. Moreover, defendant argues that, given he had informed the court multiple times that he had stopped taking the medication sometime after pleading guilty, there is a *bona fide* doubt as to defendant's fitness at sentencing where the court's conditional fitness order was in place. In response, the State contends that the court did not abuse its discretion in finding defendant fit and denying defendant's motion to withdraw guilty plea because there is "no doubt defendant was fit, both at his plea *** and at his sentencing hearing a month later." We agree with the State.

¶ 59    The due process clause of the fourteenth amendment bars prosecuting a defendant who is unfit to stand trial. *People v. Cook*, 2014 IL App (2d) 130545, ¶ 12 (citing *People v. Holt*, 2014 IL 116989, ¶ 51, citing *People v. Shum*, 207 Ill. 2d 47, 57 (2003)). "A defendant is unfit if,

24

because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2010); *People v. Burton*, 184 Ill. 2d 1, 13 (1998). Relevant factors to consider in a fitness hearing include the defendant's "knowledge and understanding of the charge, the proceedings, the consequences of a plea, judgment or sentence, and the functions of the participants in the trial process"; his "ability to observe, recollect and relate occurrences, especially those concerning the incidents alleged, and to communicate with counsel"; and his "social behavior and abilities; orientation as to time and place; recognition of persons, places and things; and performance of motor processes." 725 ILCS 5/104-16(b) (West 2012). A defendant receiving psychotropic medication will not be presumed fit solely on that basis. *Id.* § 104-21(a).

¶ 60 A circuit court's determination of fitness may not be based solely on stipulations to the existence of psychiatric conclusions or findings. *People v. Contorno*, 322 Ill. App. 3d 177, 179-80 (2001). The ultimate conclusion about a defendant's fitness must be made by the circuit court, not by the experts. *Id.* at 179. A court must analyze and evaluate the basis for an expert's opinion instead of merely relying on the expert's ultimate opinion. *Id.* " 'Normally, a trial court's decision that a defendant is fit to stand trial will not be reversed absent an abuse of discretion.' " *Cook*, 2014 IL App (2d) 130545, ¶ 13 (quoting *Contorno*, 322 Ill. App. 3d at 179). "[B]ecause the issue is one of constitutional dimension, the record must show an affirmative exercise of judicial discretion regarding the fitness determination." *Id.* (citing *Contorno*, 322 Ill. App. 3d at 179).

¶ 61 We first address whether the circuit court's order was conditional, thus, unauthorized by statute. A reading of *People v. Jones* demonstrates that, because a defendant is either fit or unfit for trial, a court that finds a defendant fit for trial with medication cannot then proceed to trial or

25

a guilty plea by ignoring evidence that the defendant was *not* taking his medication at the time of his trial or plea. See 349 Ill. App. 3d at 261-62. When that occurs, a new determination of a defendant's fitness to plead is warranted. *Id.* at 262. The court's oral pronouncement and written order in *Jones* both explicitly stated that the defendant was found fit on medication. *Id.* at 257. At the sentencing hearing, one year after the fitness hearing had been conducted by a different judge, however, a new judge, seemingly unaware of the conditional fitness order, accepted the plea and sentenced the defendant after the defendant stated he was no longer on medication. *Id.* at 258-61.

¶ 62     Here, unlike *Jones*, the circuit court's oral pronouncement and written order are inconsistent. Specifically, on October 11, 2013, the circuit judge determined on the record that defendant was "fit to assist in his defense and fit to stand trial" before proceeding to the guilty plea hearing. In the court's written order, however, the same circuit judge stated: "Defendant is FIT TO STAND TRIAL provided that Defendant maintain the following psychiatric treatment: the drug Olanzapine 20 mg. at bedtime every night." The court's written fitness determination was conditional.

¶ 63     Despite this, the court later clarified at the December 23, 2015, hearing on defendant's second amended motion to withdraw guilty plea and vacate sentence that its "clear intent" in using the language in its written order—provided that Defendant maintain the following psychiatric treatment—"was to incorporate the findings of the experts in the Court's ruling," which was that defendant's "status as fit could change if he didn't take his medicine." The court went on to state that this specific language, which was inconsistent with the oral pronouncement, was "unnecessary" because "it's *** qualifying language that is not essential to the Court's

26

ruling. It's surplusage." The court stated that its order "should not have been phrased that way, because it is subject to interpretation in a problematic way."

¶ 64     Moreover, in distinguishing the present case to *Jones*, the circuit court noted that it had used the language, although unnecessary to its overall ruling, because defendant had been found fit before and then stopped taking his medication several times, and each time, Attorney Capps, "when confronted with the change that happened to the Defendant, brought the matter to the attention of the Court" over his two years of representation. According to the court, Attorney Capps' vigilant representation is "where we take a different path from *Jones*." According to the court, a significant difference from *Jones* was that "there was no possibility that the Defendant might be unfit because he was not taking his medications. The contingency referred to in the surplusage contained in the Court's finding never materialized" because Attorney Capps had time and time again brought to the court's attention his *bona fide* doubt as to defendant's fitness when he became aware of a regression in defendant's condition due to him not taking medication. The court went on to state that the inclusion of this condition did not mean the court's order was fatally flawed. We agree. Furthermore, after having reviewed the record, the court then stated that it believed the record affirmatively showed a sufficient basis for the court's finding of fitness. We also agree.

¶ 65     A thorough review of the record demonstrates an affirmative exercise of judicial discretion in finding defendant fit. First, the circuit court considered Dr. Hanessian's extensive testimony and her stipulated report, not merely the conclusions contained therein. Dr. Hanessian, defendant's treating physician at the time of the fitness hearing, determined defendant fit to stand trial based on her recent observations of him and the fact that defendant's nurse watched defendant voluntarily take his medication in liquid form with no reported refusals. Dr. Hanessian

27

testified that it "[wa]s a pleasure to care for" defendant when he was medicated, as compared to an unmedicated defendant who displayed "argumentative" and "antagonistic" behaviors. Given that defendant's mental status and behaviors had deteriorated in the past when he was not medicated, Dr. Hanessian testified that defendant was fit to stand trial at the time of her report and on the day of the fitness hearing. Moreover, the record demonstrates defendant was housed, at the circuit court's request, at Chester Medical for 30 days for purposes of maintaining his fitness for sentencing following the guilty plea hearing.

¶ 66    Second, Attorney Capps, who had represented defendant for approximately two years at the time of the fitness hearing, believed defendant was fit to stand trial. Specifically, at the fitness hearing, Attorney Capps, who had expressed a *bona fide* doubt as to defendant's fitness on multiple occasions in the past, had "no reservations whatsoever about Mr. Williams' fitness" based on their interactions that day. Moreover, he also believed defendant had maintained fitness at the sentencing hearing one month later on November 12, 2013. In fact, Attorney Capps, was "confident" defendant was fit to proceed to sentencing because he was "alert, coherent, as easy to deal with, as capable of understanding everything that's going on as he ever has been during these proceedings." Furthermore, at sentencing, Attorney Capps brought to the court's attention defendant's calm and peaceful demeanor as compared to early proceedings where defendant was "so unruly and abusive that he was not able to even be in the courtroom for his proceedings." Based on the court's statement at the December 23, 2015, hearing that "there was no possibility that the Defendant might be unfit because he was not taking his medications," it is clear the court took into consideration Attorney Capps' vigilant representation at prior proceedings and his confidence in defendant's fitness when determining whether defendant was fit on October 11, 2013.

28

¶ 67    Lastly, although defendant now argues on appeal that he had stopped taking his medication following the guilty plea hearing on October 11, 2013, the record does not support this contention. Instead, defendant's assertion is directly contradicted where the record demonstrates defendant was lucid and adequately responsive at the sentencing hearing when he appropriately answered the circuit court's questions and understood his rights at all three hearings on October 11, 2013, and November 12, 2013. Specifically, defendant was able to explain parts of the legal process, including what the circuit judge's job would be at sentencing if defendant pled guilty or if defendant pled not guilty and a trial took place. Moreover, with regard to defendant's behavior at sentencing, the circuit judge, who had observed defendant since April 2010, agreed with Attorney Capps that there was a "staggering" difference in defendant's behavior and demeanor when he was medicated as compared to unmedicated, which further discredits defendant's argument on appeal.

¶ 68    Based on the foregoing, we cannot conclude that the circuit court abused its discretion in finding defendant fit on October 11, 2013, when he entered his guilty plea, and on November 12, 2013, when he was sentenced. Accordingly, the court did not abuse its discretion in denying defendant's motion to withdraw guilty plea and vacate sentence.

¶ 69                                    III. Conclusion

¶ 70    Based on the foregoing, the circuit court substantially complied with Rule 402 when the court admonished defendant prior to accepting his guilty plea. The court's order finding defendant fit to stand trial and subsequently denying defendant's motion to withdraw guilty plea and vacate sentence is affirmed where the record demonstrates an affirmative exercise of judicial discretion in determining defendant's fitness.

¶ 71    Affirmed.