2021 IL App (5th) 180224-U

NO. 5-18-0224

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

Decision filed 09/08/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 16-CF-1452 |
| | ) | |
| ORLANDO LUKE, | ) | Honorable |
| | ) | Robert B. Haida, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   This appeal from a judgment of conviction does not present any issue of arguable merit, and therefore the defendant's appointed counsel on appeal is granted leave to withdraw, and the judgment of conviction is affirmed.

¶ 2    The defendant, Orlando Luke, was found guilty and sentenced to prison for aggravated driving under the influence of a drug, proximately causing the death of another. He now appeals from the judgment of conviction. The defendant's court-appointed attorney on appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks merit, and on that basis OSAD has filed with this court a motion to withdraw as counsel, along with a brief in support thereof. See *Anders v. California*, 386 U.S. 738 (1967). OSAD provided the defendant with a copy of its *Anders* motion and brief. This court provided the defendant with ample opportunity to file a *pro se* brief, memorandum, or other document explaining why OSAD should not be allowed

1

to withdraw or why this appeal has substantial merit, but the defendant has not availed himself of that opportunity. This court has examined OSAD's *Anders* motion and brief and the entire record on appeal. For the reasons that follow, this court has concluded that the instant appeal does indeed lack merit, obliging this court to grant OSAD's *Anders* motion and to affirm the judgment of conviction.

¶ 3                                                                   BACKGROUND

¶ 4      In December 2016, a grand jury returned an indictment charging the defendant with reckless homicide (720 ILCS 5/9-3(a) (West 2016)) and aggravated driving under the influence of a drug, proximately causing the death of another (625 ILCS 5/11-501(a)(6), (d)(1)(F) (West 2016)). The defendant allegedly drove a truck-tractor recklessly and under the influence of cocaine, thereby causing the death of Cheryl Culver.

¶ 5      In July 2017, the State filed a notice of intent to introduce recordings of 911 calls as spontaneous declarations or excited utterances. In August 2017, the State filed a notice of intent to impeach the defendant, should he choose to testify, with four Georgia felony offenses, namely: possession of cocaine, aggravated assault (two counts), and fleeing or attempting to elude a peace officer. The defendant was convicted of these Georgia offenses on May 21, 2004; he was released on parole on July 12, 2010.

¶ 6      On September 15, 2017, the State, the defendant, and defense counsel appeared before the circuit court for a pretrial hearing. The court inquired as to whether the defendant, who was in custody, was receiving medications and whether those medications interfered with his understanding of "what's going on" in court. The defendant answered that he had been given three medications—for pain, anxiety, and sleep—and he did not think that they interfered with his understanding. Defense counsel indicated that he had not detected any adverse effects from the

2

medications. The court seemed satisfied with these responses. It called a hearing on pretrial motions, disposing of or otherwise addressing several issues. Defense counsel then stated that the defendant wished to address the court on his written *pro se* motion for "substitution of attorney." The judge said to the defendant, "I haven't seen what you've prepared," but he asked whether the defendant was dissatisfied with defense counsel. "To a degree, yes, sir," the defendant answered. There followed a discussion about discovery, the viewing of discovery materials in jail, public defenders and their heavy caseloads, and defense counsel's control over legal strategy. During this discussion, the defendant described defense counsel as "very capable." At the end of the discussion, the judge said, "I'm going to take it as your oral request for me to appoint someone other than [defense counsel]," and the court denied the request. Later that same day, the court entered an order stating that the defendant's "oral motion to substitute counsel" was denied.

¶ 7 On September 18, 2017, three days after the above-described hearing, the defendant filed a *pro se* "motion for substitution of counsel." Despite the style of the motion, the defendant did not seek to substitute counsel; he sought to represent himself.

¶ 8 On November 9, 2017, the State, the defendant, and defense counsel appeared before the court and addressed the State's notice of intent to introduce 911 calls, filed in July 2017, and its notice of intent to impeach the defendant with the Georgia felonies, filed in August 2017. Defense counsel stated that "it's difficult to determine how much time has passed between when the [911] call was made and when this alleged incident occurred," and he argued that this difficulty would make it impossible for the jury to use the calls to determine the case's "strengths and weaknesses." He also stated that if the 911 calls were admitted into evidence, the defendant would not be able to cross-examine the callers, in violation of the confrontation clause. The State stated that the 911 calls described a truck-tractor's movements on roadways in Fairview Heights and O'Fallon,

3

Illinois, prior to the truck-tractor's collision that was at issue here.  Under *Davis v. Washington*, 547 U.S. 813 (2006), the State argued, 911 calls were not testimonial in nature.  Wanting to listen to the 911 recordings before ruling, the court took the matter under advisement.  Moving on to the four Georgia felonies with which the State wanted to impeach the defendant, the State and defense counsel disagreed as to whether the probative value of those convictions was substantially outweighed by the danger of unfair prejudice to the defendant under *People v. Montgomery*, 47 Ill. 2d 510 (1971).  In the end, the court admitted only one of the four prior convictions—the conviction for cocaine possession—for impeachment purposes.  (The defendant's *pro se* "motion for substitution of counsel" was not mentioned, by anyone.)

¶ 9       On November 22, 2017, the State, the defendant, and defense counsel attended a pretrial hearing.  The court stated that it wanted to listen to the 911 recordings again.  Relevance was the primary issue, according to the court.  "[T]he hearsay part of it I'm not focused on," the court said.  "I'm focused on the relevance of it."  (The defendant's *pro se* "motion for substitution of counsel" was not mentioned, by anyone.)

¶ 10      On November 27, 2017, minutes before the jury trial began, the parties met with the court and discussed the 911 calls as evidence.  The court ruled that it would bar the use of that portion of the 911 recordings that included statements made by Zannia Adkinson, a Georgia resident whom both parties had sought to call as a witness but who was unavailable to testify.  "I think it's admissible as an exception to the hearsay rule," the court explained, "but I still feel that there's a balancing between prejudicial effect and probative value."  Adkinson, who was not named in the 911 calls, is heard stating that she was "thrown" out of "the truck" by "Orlando Luke."  The court also barred the playing of any recorded reference to Adkinson's statement that the driver had thrown her from the truck.  (The defendant allegedly was driving a truck-tractor, with no trailer

4

attached, at the time of the charged offenses.)  The court thought that this statement about being thrown from the truck could be considered evidence of an uncharged crime, such as attempt murder.  Other than those Adkinson-related portions, the court allowed the State's playing of the 911 recordings.  (The defendant's *pro se* "motion for substitution of counsel" was not mentioned, by anyone.)

¶ 11    With pretrial matters out of the way, the court conducted *voir dire*.  A jury was selected.

¶ 12    During opening statement, defense counsel asked the jury to remember the name Zannia Adkinson and the difference between direct evidence and circumstantial evidence.  He said that Adkinson was alleged to have been in the cab of the truck-tractor, along with the defendant, two to three miles before the accident occurred.  "Why," defense counsel asked rhetorically, "are they not having this witness testify in front of you to present direct evidence of what happened on November 8th, 2016?"  Counsel went on to conclude his opening statement.  The court then told the jury that "some issues [had] arisen" that needed to be addressed outside their presence, and he had the jury removed from the courtroom.  Outside the presence of the jury, the court addressed defense counsel, saying, "you've done something here, and I'm very concerned about what you did" but that he was "not really sure what to do about it."  The court criticized counsel for "improperly taking advantage" of his ruling that the State could not play for the jury that portion of the 911 recordings that included statements by Adkinson.  In response to the court's question, defense counsel conceded that Adkinson was on his witness list, too.  "But the State can't make that argument," the court stated, "because then that shifts the burden.  They can't do that."  As a remedy for defense counsel's improperly suggesting that "the State is choosing not to call a witness," the court reversed its prior ruling on the 911 recordings and "allow[ed] the State to play the complete tape."  Defense counsel objected.

5

¶ 13    The State's trial evidence showed that on November 8, 2016, at approximately 9:15 p.m., a white truck-tractor, with no trailer attached, was eastbound on Highway 50, approaching the intersection with Scott-Troy Road. The truck-tractor was in the left turn lane, and had a red light, as it proceeded straight into the intersection. It was traveling at least 60 miles per hour when it collided with a white Ford Ranger pickup truck, which was northbound on Scott-Troy Road, approximately halfway through the intersection with Highway 50. The truck-tractor hit the pickup truck on the bed of the driver's side, and the impact sent the pickup truck spinning around multiple times before it came to rest in the grass approximately 50 feet northeast of the intersection. The bed of the pickup was destroyed, and both of the rear wheels were dislodged from the truck. The truck-tractor left no visible skid marks prior to hitting the pickup. After striking the pickup in the intersection, the truck-tractor continued eastbound on Highway 50. At a speed of approximately 60 to 64 miles per hour, it hit a westbound Ford Escape that was moving at approximately 15 miles per hour, approaching the red light at the intersection with Scott-Troy Road. The impact pushed the Ford Escape backwards approximately 376 feet to the southeast, into the ditch south of Highway 50, where it landed upside-down. The Ford Escape's entire front end—including the front axle, the hood, and the engine—were gone. Its engine flew through the rear of a Chrysler PT Cruiser, covering the driver's side with motor oil, before landing in the street. From the driver's seat of the upside-down Ford Escape, Cheryl Culver, age 67, was hanging from her seat belt. She showed no signs of life. No passengers were in the Ford Escape. Additional vehicles were damaged by flying car parts and debris, which were strewn about Highway 50

¶ 14    After hitting the Ford Escape, the truck-tractor continued eastbound for a short while, in the westbound lanes, and came to a stop on the north side of Highway 50, partially in the grass and partially in the entrance to Sweetwater Car Wash. The car wash was just to the east of a MotoMart,

6

which was at the northeast corner of the intersection of Highway 50 and Scott-Troy Road. The truck-tractor was a 2009 Kenworth. Appearing on the back and the driver's side of the truck-tractor were the logo of "L F Xpress" and the name of the town "Augusta, Ga." The truck-tractor was badly damaged, with its front axle dislodged and its hood ripped off and lying about 75 feet to the northwest.

¶ 15 Mikayla Smith testified that on November 8, 2016, around 9 p.m., she was at work in O'Fallon, preparing to go to Denny's on Highway 50 for dinner. Leaving work, she drove east on Highway 50, and she was just about to turn right onto the Denny's parking lot when she saw a white truck-tractor, with no trailer attached, "flying right by me. He just about hit the back of my car." She decided to follow the truck-tractor and called 911. She lost sight of the truck-tractor as it went around a curve on Highway 50, but she drove on. After approximately one mile in her pursuit, Smith stopped for the red light on Highway 50 at Lincoln Street. On the other side of Lincoln Street, she saw two cars with their hazard lights on and a woman "leaned over the hood of a car" in front of a McDonald's. When her light turned green, Smith proceeded across Lincoln Street, stopped near the cars, and got out of her car. The woman "was distraught, and she looked really weak like she couldn't hold herself up." She was screaming very loudly and crying. "She yelled that he threw her out of the truck," and when Smith asked who, the woman stated, "Orlando Luke." Smith remained with the woman "until the ambulance took her away."

¶ 16 For the jury, the State played approximately 10 minutes of recorded 911 calls. These calls were from various people, were mostly anonymous, and consisted largely of callers describing a white truck-tractor, with no trailer attached, as it was driven fast and erratically on eastbound Highway 50 in O'Fallon, Illinois, and as it collided with other vehicles as it entered the intersection with Scott-Troy Road. Mikayla Smith's 911 call was included. In it, Smith is heard speaking with

an unidentified but very distraught-sounding woman. The woman stated that she had been thrown from a truck-tractor by "Orlando Luke."

¶ 17    Casey Allene Berberich, a college student, testified that on November 8, 2016, at approximately 9:15 p.m., she was turning right from Scott-Troy Road onto Highway 50, eastbound. She was stopped behind a car waiting to turn left into the MotoMart. As she started to move past the stopped car, she heard "an awfully loud noise" and the "clanking of metal." As she moved further, she heard "a roaring sound" and saw "smoke, oil, car parts, [and] tires flying across the road in front of me." She continued driving east on Highway 50, but after realizing that her car was dragging something underneath, she pulled over to the side of the road.

¶ 18    Right after Berberich pulled over, she saw to her right a truck-tractor. It was pointing east but was sitting in a small grassy area just north of Highway 50. A man got out of the driver's side of the truck-tractor. The man was "pretty quick" but "limping" as he headed north in "a sort of diagonal veering towards the car wash." He walked up to a chain-link fence and "follow[ed] it back behind the car wash until he hit[ ] a wooden fence." At that point, he turned a corner and disappeared from her view. Due to lighting at the car wash and the MotoMart, Berberich was able to see the man. "He was African American," though not "very dark," was "probably like middle-aged," and he wore "like a sweatshirt" that was dark in color and "black long pants, maybe like work pants." She did not think he had facial hair; he definitely did not have a full beard, for she would have seen that easily. As for the truck-tractor, it was missing its hood. She did not know where the truck-tractor had come from, since she had not seen it in the intersection. "It came out of nowhere," she said. Berberich also saw a car that was "completely flipped over" in a ditch.

¶ 19    Berberich further testified that "[m]aybe about two minutes" after the man departed from the truck-tractor, police officers arrived and began to search it. As she watched them, Berberich

8

realized that she "totally saw a man get out of the [truck-tractor]" and "make a break for it." She got out of her car and told police all that she had seen. She made a statement on video and gave police her telephone number. The police mentioned something about identifying the man in a lineup, but they never got back to her.

¶ 20 Joyce E. Walker testified that on November 8, 2016, at about 9 p.m., she was outside the house that was just to the east of the car wash on Highway 50, near Scott-Troy Road. She heard "crashes" and saw that all the cars on the road had stopped. A truck-tractor had stopped in front of the car wash, and a man in dark clothing stood next to the driver's door. "He was limping" as he "took off" to the rear of the car wash and walked along a chain-link fence. He was heading in the direction of Scott-Troy Road at the time Walker lost sight of him.

¶ 21 Samantha Larson, a college student at Southern Illinois University-Edwardsville (SIU-E), testified that on November 8, 2016, she was a passenger in a car that was westbound on Highway 50. As their car approached the intersection with Scott-Troy Road, Larson saw a truck-tractor "coming quickly" toward them. They stopped. The truck-tractor braked and "swerved across the road in front of us. The hood of the [truck-tractor] went one way *** and the [truck-tractor] went the other way into a ditch and then into the parking lot." Just one person was in the truck-tractor, "a darker man" who wore "all dark clothes." The man "jumped out of the semi." She "couldn't get a good look at him" but "could see like his build." He "was hopping on one foot" as he "ran towards the field" that was behind the car wash. Larson then lost sight of him.

¶ 22 Michael Adamson, an O'Fallon police officer, testified that on November 8, 2016, he was on patrol when he responded to radio traffic concerning a collison at Highway 50 and Scott-Troy Road. He drove his squad car from State Street, which becomes Old Vincennes Trail, and turned right, or south, onto Scott-Troy Road. As he drove south on Scott-Troy Road, Adamson saw "a

9

black male in dark-colored coveralls" on the west side of Scott-Troy Road, approximately 100 yards north of the intersection with Highway 50. The man was walking north, away from the intersection with Highway 50, and with a "very apparent" limp. Adamson pulled over and talked to the man. A "large knot" on his forehead, a scratch on his face, and "some cuts on his hands" made Adamson think that the man had been involved in the accident. He asked the man for identification, and the man produced a Georgia identification card or driver's license identifying him as Orlando Luke. Adamson identified the defendant as the man he encountered on Scott-Troy Road.

¶ 23    Meanwhile, the police asked Larson, the SIU-E college student, whether she could identify the driver of the truck-tractor. When she said that she could, an officer drove her in a squad car to the place where the defendant had been stopped, for a showup. Adamson had the defendant stand near his squad car and shined a spotlight on him. Larson, sitting in the other officer's squad car, looked at the suspect and said that she thought that he was the man she had seen get out of the truck-tractor. The police had the suspect "turn to the side" for Larson. At that point, Larson "said it was him." The suspect "had the same build" and "was wearing the same clothes" as the man she had seen get out of the truck, Larson said. The officer who drove Larson to the showup testified that the suspect whom Larson identified was the defendant. Larson was the only witness who participated in a showup identification. Adamson placed the defendant in the back of his patrol car. The defendant was driven to a hospital and hence to the county jail.

¶ 24    The defendant's wallet and contents were admitted into evidence. Inside the wallet were two Georgia commercial driver's licenses for "Orlando Velentino Luke" and a VISA debit card with the cardholder's name "Orlando V. Luke" and underneath it, "L.F. XPRESS, Incorporated."

¶ 25 At approximately 2 a.m. on November 9, 2016, or approximately 4¾ hours after the collision between the truck-tractor and Cheryl Culver's Ford Escape, urine and blood samples were collected from the defendant, pursuant to a search warrant. Illinois State Police forensic analysis showed that in the urine, cocaine and cocaine metabolites were detected. In the blood, no cocaine was detected, but benzoylecgonine, a cocaine metabolite, was found at 1440 micrograms per liter.

¶ 26 An autopsy showed that Cheryl Culver had serious injuries to both the external surfaces and the internal organs of her body, including contusions to her head, abrasions on her torso and upper chest, lacerations on her liver and left lung, and broken bones in the right arm, right leg, and left thigh. Blood was found in both the thoracic and abdominal cavities. The cause of death was determined to be blunt thoracic, abdominal, and pelvic trauma.

¶ 27 For the defense, Dr. Sarah Riley, the director of the Forensic Toxicology Laboratory at Saint Louis University, testified as an expert that she reviewed the lab work performed by the Illinois State Police on the defendant's urine and blood. In urine, Riley explained, the presence of a drug indicates "exposure to a drug at some point in the past." Cocaine's presence in the defendant's urine cannot establish that the defendant was impaired. As for the blood, Riley testified that the presence of benzoylecgonine, which was found in the defendant's blood, cannot cause any impairment; it has no effect on the body's physiology. The half-life of cocaine "can be anywhere from a half hour to an hour and a half," and therefore the time lapse from the traffic incident to the drawing of the blood could have permitted the cocaine to go through "several half lives." If the blood had been drawn sooner, cocaine may have been detected in the blood. Riley could not say whether the defendant had cocaine in his blood at the time of the traffic incident, but his blood must have had cocaine in it at some point in order for the benzoylecgonine to be present. Under cross-examination by the State, Riley testified that the data showed "a possibility" that the

11

defendant was impaired at the time of the traffic incident, but the data could not prove "definitively" that he was impaired. The presence of benzoylecgonine in the blood, she said, "only tells me that there had been cocaine ingestion most likely within six hours." To Riley, 1440 micrograms of benzoylecgonine per liter of blood did not seem like a "shockingly high number. It's just like, okay, this is a cocaine user." The State asked, "He is a cocaine user?" Riley answered, "Yes."

¶ 28    The defendant also testified, against the advice of counsel. He testified that he had driven his truck-tractor, with a trailer attached, from Augusta, Georgia, to Illinois. Zannia Adkinson was his passenger. On November 8, 2016, the two checked into a motel in Fairmont, Illinois. The defendant parked his rig on the motel's parking lot. During their stay at the motel, the defendant and Adkinson had several arguments. During the evening of November 8, the defendant went to inspect his rig. A system detected that something was wrong with the air pressure, and the defendant disconnected the air hoses. In the cab of the truck-tractor, the defendant did some paperwork. Feeling exhausted and strange, he locked his door and went to sleep in the cab of the truck. The defendant was not sure whether "the shaking of the truck" woke him, but he did awake to find two people in the cab—a tall, dark-skinned man with a slender build and dreadlocks who was wearing dark clothes, and Adkinson. "There was a strong box in their hand, which was my strong box." The strong box contained more than $3000 that the defendant had allocated for expenses during the trip to Illinois. The defendant began to fight the tall, slender man and Adkinson. "[T]hings went black" and "[t]hat was the last thing I can remember outside of someone buffeting me and having me at the hospital, telling me, you kill people, you kill people."

¶ 29    On cross-examination by the State, the defendant acknowledged that he owned the truck-tractor found at the car wash on Highway 50, and that he had driven it from Georgia to Illinois,

12

however, he could not have been the only one driving it on November 8, 2016, and he definitely did not drive it on the evening of November 8. To the best of his memory, he last drove the truck when he parked it at the motel. As for running from the truck, the defendant said that he had not run anywhere in 20 years, due to suffering from reflex sympathetic dystrophy, a disease that precludes him from bearing his body weight on his right leg. In rebuttal, the State presented a certified copy of the defendant's May 2004 conviction for felony possession of cocaine in Screven County, Georgia.

¶ 30   During closing argument, the main focus of defense counsel was identification. Counsel asserted that the State had not proved that the defendant was the driver of the truck-tractor. The secondary argument, taking up just two paragraphs in the transcript, was that the State had failed to prove that the defendant was impaired.

¶ 31   The jury found the defendant guilty of reckless homicide and aggravated driving under the influence of a drug, as charged.

¶ 32   On January 18, 2018, the court held a hearing in aggravation and mitigation, and sentenced the defendant to 14 years of imprisonment, and 2 years of mandatory supervised release, for the charge of aggravated driving under the influence of a drug, proximately causing the death of another. The charge of reckless homicide was found to have merged with that charge, and therefore no sentence was imposed thereon. (The defendant's *pro se* "motion for substitution of counsel" was not mentioned, by anyone.)

¶ 33   On January 24, 2018, the defendant filed two motions—a motion for new trial and a motion to reconsider sentence. In the former motion, he alleged, *inter alia*, that the State failed to prove him guilty beyond a reasonable doubt, and that the court erred in allowing the State to play "all 911 recordings" for the jury. In the latter, the defendant alleged, *inter alia*, that the sentence was

13

excessive. On April 5, 2018, the court held hearings on those two motions and denied them both. (The defendant's *pro se* "motion for substitution of counsel" was not mentioned, by anyone.)

¶ 34 The defendant filed a timely notice of appeal and an amended notice of appeal. The circuit court appointed OSAD to represent the defendant on appeal.

¶ 35                                    ANALYSIS

¶ 36 This appeal is from a judgment of conviction. As previously mentioned, the defendant's appointed attorney on appeal, OSAD, has filed an *Anders* motion to withdraw as counsel on the basis that this appeal lacks merit, and the defendant has not filed a response. This court has examined OSAD's *Anders* motion and brief, and the entire record on appeal, and shares OSAD's overall assessment of the case.

¶ 37 In its *Anders* brief, OSAD addressed four potential issues in this case, *viz.*: (1) whether the circuit court committed reversible error in failing to act on the defendant's motion to represent himself; (2) whether the circuit court erred in admitting, for purposes of impeachment, evidence of the defendant's prior conviction for cocaine possession; (3) whether the circuit court erred in admitting all of the 911 recordings pertaining to the reckless driving of the truck-tractor; and (4) whether defense counsel provided ineffective assistance, or whether the evidence was insufficient to find the defendant guilty beyond a reasonable doubt. None of these potential issues has any merit.

¶ 38 The first of OSAD's four potential issues is whether the circuit court committed reversible error in failing to act on the defendant's motion to represent himself. A defendant has a constitutional right to waive counsel and to represent himself. *Faretta v. California*, 422 U.S. 806, 818 (1975); *People v. Burton*, 184 Ill. 2d 1, 21 (1998). However, a defendant's invocation of that right must be "clear and unequivocal, not ambiguous." *Burton*, 184 Ill. 2d at 21. Furthermore,

14

even if he makes a clear and unequivocal invocation of the right, he may subsequently abandon his request to proceed *pro se*, and acquiesce in representation by counsel, through his own conduct. *Id.* at 23-24 (collecting cases). That is what happened here. The defendant filed his request to proceed *pro se*—incorrectly styled a "motion for substitution of counsel"—on September 18, 2017. However, in the following months, the court held at least two substantive pretrial hearings, a jury trial, and a sentencing hearing, and the defendant, despite being present, never brought the motion to the court's attention. He never requested a ruling on the motion. Indeed, he never even mentioned the motion. "A defendant may forfeit self-representation by remaining silent at critical junctures of the proceedings." *Id.* at 24. Here, the defendant forfeited self-representation through his silence.

¶ 39    The second of OSAD's four potential issues is whether the circuit court erred in admitting, for purposes of impeachment, evidence of the defendant's prior conviction for cocaine possession. The defendant did not raise this issue in his posttrial motion, thereby forfeiting it on appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Even if this issue had been properly preserved, it would not have helped the defendant.

¶ 40    Evidence of a prior conviction is admissible to impeach a defendant's credibility if (1) the crime was punishable by death or imprisonment for more than one year, or involved dishonesty or a false statement; (2) less than 10 years has elapsed since the defendant was convicted or released from confinement, whichever is later; and (3) the risk of unfair prejudice does not substantially outweigh the probative value of admitting the convictions. Ill. R. Evid. 609(a) (eff. Jan. 1, 2011); *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971). The circuit court has discretion in deciding whether to allow the State to use a prior conviction for impeachment purposes. *People v. Mullins*, 242 Ill. 2d 1, 15 (2011). This court will reverse the ruling only if it represents an abuse of

15

discretion. *People v. Melton*, 2013 IL App (1st) 060039, ¶ 17. An abuse of discretion will be found only where the circuit court's ruling is arbitrary, or when it substantially prejudices the defendant by exceeding the bounds of reason and ignoring recognized principles of law. *Id.* ¶ 18.

¶ 41    Here, it is undisputed that the defendant's prior Georgia conviction for cocaine possession satisfied the first two prongs of Illinois Rule of Evidence 609(a)—it was a crime punishable by imprisonment for more than one year, and less than 10 years had elapsed since the defendant was released from confinement. Furthermore, the transcript of the November 9, 2017, pretrial hearing makes clear that the circuit court engaged in the type of balancing of unfair prejudice and probative value that is required by the third prong of Rule 609(a). It could be argued that a cocaine-possession conviction increased the danger of unfair prejudice where the defendant was on trial for driving under the influence of cocaine. More specifically, the conviction may have created an impression that the defendant was a habitual user of cocaine. However, this danger was addressed by an instruction that the jury could consider the prior conviction "only as it may affect [the defendant's] believability as a witness," and could not consider it as evidence that the defendant was guilty of the crimes charged in the instant case. Also, the impression that the defendant was a habitual user of cocaine was created far more strongly by the defendant's own expert, Dr. Sarah Riley, who testified that the defendant was "a cocaine user." The circuit court did not abuse its discretion in admitting, for impeachment purposes, evidence of the defendant's prior conviction for cocaine possession. See also *People v. Atkinson*, 186 Ill. 2d 450, 463 (1999) (no abuse of discretion in allowing defendant, on trial by jury for burglary, to be impeached by his two prior convictions for burglary).

¶ 42    The third of OSAD's four potential issues is whether the circuit court erred in admitting all of the 911 recordings pertaining to the reckless driving of the truck-tractor. The United States

16

Constitution and the Illinois Constitution guarantee a criminal defendant the right to confront his accusers. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. However, hearsay statements made to a 911 operator may be admitted against a defendant without violating the confrontation clause, because those statements are not testimonial. *Davis v. Washington*, 547 U.S. 813, 828-29 (2006). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 822. Whether a statement was testimonial is a question of law, and appellate review is *de novo*. *People v. Sutton*, 233 Ill. 2d 89, 112 (2009).

¶ 43    Here, the 911 calls admitted at the defendant's trial were definitely nontestimonial. Almost all of the statements made during those calls, from various callers, were contemporaneous reports of where the errant truck-tractor was going (*e.g.*, "headed eastbound on Highway 50"), what it was doing (*e.g.*, "he just like flew past me in a turn lane"), and the immediate results (*e.g.*, "there's been a bad accident on Highway 50 *** at Scott-Troy Road") so as to enable police to understand and to meet the emergency.

¶ 44    The 911 recordings were offered into evidence as an excited-utterance, or spontaneous-declaration, exception to the hearsay rule. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Generally, it is inadmissible. Ill. R. Evid. 802 (eff. Jan. 1, 2011). An exception is made for a statement deemed an "excited utterance," which is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. Apr. 26, 2012). The excited-utterance exception to the hearsay rule is essentially the same as the spontaneous-declaration exception and is analyzed similarly. See *Sutton*, 233 Ill. 2d at 101; *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 68. "For a hearsay

17

statement to be admissible under the spontaneous declaration exception, (1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) there must be an absence of time for the declarant to fabricate the statement, and (3) the statement must relate to the circumstances of the occurrence." *People v. Williams*, 193 Ill. 2d 306, 352 (2000). "In determining whether a hearsay statement is admissible under the spontaneous declaration exception, courts employ a totality of the circumstances analysis," examining factors such as the nature of the occurrence, the passage of time between the occurrence and the making of the statement, the mental and physical condition of the person making the statement, and the presence or absence of self-interest. *Id.* The admission of evidence is reviewed for an abuse of discretion, which will be found only if the circuit court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Herring*, 2018 IL App (1st) 152067, ¶ 62.

¶ 45 Here, all of the 911 statements were made contemporaneously with the truck-tractor's rapid and erratic movement on Highway 50—a startling event, to be sure. They were made under the stress of excitement caused by the event, and with no time to fabricate. Accordingly, their admission was not an abuse of discretion.

¶ 46 The fourth of OSAD's four potential issues was whether defense counsel provided ineffective assistance, or whether the evidence was insufficient to find the defendant guilty beyond a reasonable doubt. A claim of ineffective assistance of counsel requires the defendant to demonstrate both (1) that counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). Here, defense counsel may have erred in his opening statement to the

18

jury, when he asked rhetorically, "Why are they not having this witness [Zannia Adkinson] testify in front of you to present direct evidence of what happened on November 8th, 2016?" The court found that defense counsel had improperly suggested that the State was choosing not to call a witness, and for a remedy the court reversed its prior ruling on the 911 recordings and allowed the State to play the recordings in their entirety. However, even if counsel's performance was deficient, there is no reasonable probability that, but for counsel's error, the result of the trial would have been different. The evidence of guilt was simply too great.

¶ 47    After the horrific crashes in or near the intersection of Highway 50 and Scott-Troy Road in O'Fallon, including the one that killed Cheryl Culver, the white truck-tractor came to rest in front of a car wash. Three unrelated witnesses testified that they saw one person—and only one person—get out of that truck-tractor and limp to the back of the car wash. At least one of those three witnesses, Joyce E. Walker, testified that she saw the driver head in the direction of Scott-Troy Road. On Scott-Troy Road, about 100 yards north of the intersection with Highway 50, Officer Michael Adamson stopped the defendant, who had a "large knot" on his head and other minor injuries consistent with a vehicular crash, as he limped northward, away from the collisions. In a showup, the defendant was promptly identified by another of those three unrelated witnesses, Samantha Larson, as the man who had gotten out of the truck-tractor. Perhaps more importantly, in terms of tying the defendant to the truck-tractor, the defendant's wallet contained a VISA debit card with the defendant's own name and the name "L.F. XPRESS, Incorporated," and the semi-truck itself had the logo of "L F Xpress" emblazoned on it. Furthermore, the defendant had a commercial driver's license from the State of Georgia and the truck-tractor's writing indicated that it was from "Augusta, Ga." It is difficult to imagine a stronger case of identification built on circumstantial evidence.

19

¶ 48 Also, forensic analysis showed that in the defendant's urine, cocaine and cocaine metabolites were detected, and in his blood, benzoylecgonine, a cocaine metabolite, was found at 1440 micrograms per liter. The statute for driving under the influence of a drug states that a person "shall not drive or be in actual physical control of any vehicle" while there is "any amount of a drug, substance, or compound in the person's breath, blood *** or urine resulting from the unlawful use or consumption of a controlled substance." 625 ILCS 5/11-501(a)(6) (West 2016). Impairment was not necessary for a finding of guilt; cocaine or a metabolite in the blood or urine was enough. The death of Cheryl Culver, proximately caused by the defendant's driving under the influence, elevated the offense to an aggravated offense. *Id.* § 11-501(d)(1)(F). Looking at the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, the essential elements of aggravated driving under the influence of a drug, proximately causing the death of another. See *People v. Hagberg*, 192 Ill. 2d 29, 33-34 (2000) (standard of review for insufficient-evidence claims).

¶ 49 As if the State's case against the defendant were not strong enough by itself, the defendant disregarded the advice of counsel and testified on his own behalf. The defendant connected himself to the truck-tractor by acknowledging that he, in fact, owned it, and he stated that he had recently driven it from Augusta, Georgia. After that, the defendant's testimony quickly veered off into the ridiculous, with a tale of his falling asleep in the cab of the truck-tractor, his waking up to an attempted robbery of his strong box by an unknown male and Zannia Adkinson, and his immediate and sudden loss of consciousness ("things went black") until he woke up in the hospital. There was no explanation of how the defendant ended up on Scott-Troy Road at the time of the collisions. The defendant should have listened to his attorney, who generally did a fine job with the little he had to work with.

20

¶ 50                                    CONCLUSION

¶ 51    All four of the potential issues addressed by OSAD are completely without merit.  Also, this court has not found, on its own, any issue of arguable merit.  Accordingly, this court grants OSAD's *Anders* motion for leave to withdraw as counsel and affirms the judgment of conviction entered by the circuit court.


¶ 48    Motion granted; judgment affirmed.